IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THE UNITED STATES ex rel.** | ) | |
| **FREEDOM UNLIMITED, INC.,** | ) | |
| **NORTHSIDE COALITION FOR FAIR** | ) | |
| **HOUSING, INC., THE HILL DISTRICT** | ) | |
| **CONSENSUS GROUP, INC.** and the | ) | |
| **FAIR HOUSING PARTNERSHIP OF** | ) | |
| **GREATER PITTSBURGH,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:12cv1600 |
| | ) | **Electronic Filing** |
| **THE CITY OF PITTSBURGH,** | ) | |
| **PENNSYLVANIA** and **LUKE** | ) | |
| **RAVENSTAHL,** its Chief Executive | ) | |
| Officer, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

Plaintiffs Freedom Unlimited, Inc. ("FUI"), Northside Coalition for Fair Housing, Inc.

("NCFH"), The Hill District Consensus Group, Inc. ("HDCG") and the Fair Housing Partnership

of Greater Pittsburgh ("FHP") (collectively "plaintiffs"), brought this *qui tam* action on behalf of

the United States of America against the City of Pittsburgh, Pennsylvania ("the City" or

"defendant"), and its former mayor, Luke Ravenstahl ("Ravenstahl") (collectively "defendants"),

pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733.  Plaintiffs allege that

defendants submitted express and implied false certifications of compliance in order to receive

federal funding under programs administered by the United States Department of Housing and

Urban Development ("HUD").  The United States declined to intervene.  Presently before the

court is defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) for

lack of subject matter jurisdiction, 12(b)(6) and 8(a)(2) for failure to state a claim upon which

relief can be granted, and 9(b) for failure to plead fraud with particularity. For the reasons set

forth below, defendants' motion will be granted.

## I.    STANDARD OF REVIEW

Under a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the

plaintiff bears the burden of persuasion in establishing subject matter jurisdiction. Kehr

Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991). There are two categories of

Rule 12(b)(1) motions: a facial attack on the complaint and a factual attack that challenges the

plaintiff's facts. Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).

In reviewing a facial attack, "the court must only consider the allegations of the complaint and

documents referenced therein and attached thereto, in the light most favorable to the plaintiff."

Gould Elecs., Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000).

If the attack is factual, however, the court is not confined to the allegations in the

complaint and "can look beyond the pleadings to decide factual matters relating to jurisdiction."

Cestonaro v. United States, 211 F.3d 749, 752 (3d Cir. 2000) (citation omitted). The court,

therefore, must weigh the evidence relating to jurisdiction, "with discretion to allow affidavits,

documents, and even limited evidentiary hearings," and "accord[] plaintiff's allegations no

presumption of truth." Turicentro, S.A. v. Am. Airlines, Inc., 303 F.3d 293, 300 n.4 (3d Cir.

2002). Further, in a factual challenge the plaintiff bears the burden of proving that jurisdiction

does, in fact, exist. Carpet Group Int'l v. Oriental Rug Imps. Ass'n, 227 F.3d 62, 69 (3d Cir.

2000).

It is well-settled that in reviewing a motion to dismiss under 12(b)(6) "[t]he applicable

standard of review requires the court to accept as true all allegations in the complaint and all

reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). Under the Supreme Court's decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 561 (2007), dismissal of a complaint pursuant to Rule 12(b)(6) is proper only where the averments of the complaint plausibly fail to raise directly or inferentially the material elements necessary to obtain relief under a viable legal theory of recovery. Id. at 544. In other words, the allegations of the complaint must be grounded in enough of a factual basis to move the claim from the realm of mere possibility to one that shows entitlement by presenting "a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Twombly, 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In contrast, pleading facts that only offer "'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" nor will advancing only factual allegations that are "'merely consistent with' a defendant's liability." Id. Similarly, tendering only "naked assertions" that are devoid of "further factual enhancement" falls short of presenting sufficient factual content to permit an inference that what has been presented is more than a mere possibility of misconduct. Id. at 1949-50; see also Twombly, 550 U.S. at 563 n. 8 (A complaint states a claim where its factual averments sufficiently raise a "'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support the claim.") (quoting Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347 (2005) & Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741 (1975)); accord Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997) (a court need not credit "bald assertions" or "legal conclusions" in assessing a motion to dismiss) (citing with approval Charles Alan Wright & Arthur R. Miller, FEDERAL

PRACTICE AND PROCEDURE § 1357 (2d ed. 1997) ("courts, when examining 12(b)(6) motions, have rejected 'legal conclusions,' 'unsupported conclusions,' 'unwarranted inferences,' 'unwarranted deductions,' 'footless conclusions of law,' or 'sweeping legal conclusions cast in the form of factual allegations.'").

This is not to be understood as imposing a probability standard at the pleading stage. Iqbal, 556 U.S. at 678 ("'The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'"); Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (same). Instead, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest the required element ... [and provides] enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" Phillips, 515 F.3d at 235; see also Wilkerson v. New Media Technology Charter School Inc., 522 F.3d 315, 321 (3d Cir. 2008) ("'The complaint must state 'enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'") (quoting Phillips, 515 F.3d at 235) (citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 550 U.S. at 563.

A plaintiff alleging violations of the False Claims Act also must meet the pleading standard for fraud under Fed. R. Civ. P. 9(b). The United States Court of Appeals for the Third Circuit ("Third Circuit") has held "that plaintiffs must plead FCA claims with particularity in accordance with Rule 9(b)." U.S. ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 301, n. 9 (3d Cir. 2011) ("Wilkins") (citing U.S. ex rel. LaCorte v. Smith-Kline Beecham Clinical Labs., 149 F.3d 227, 234 (3d Cir. 1998)). Rule 9(b) requires a party "alleging fraud…[to] state

with particularity the circumstances constituting fraud," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Rule 9(b) exists to insure adequate notice so that defendants can intelligently respond." U.S. ex rel. Richards v. R & T Investments LLC, 29 F. Supp.3d 553, 560 (W.D. Pa. July 3, 2014) (Hornak, J.) ("Richards") (citing Illinois Nat. Ins. Co. v. Wyndham Worldwide Operations, Inc., 653 F.3d 225, 233 (3d Cir. 2011) (citing Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C., 331 F.3d 406, 414 n. 2 (3d Cir. 2003) ("The purpose of Rule 9(b) is to provide notice, not to test the factual allegations of the claim.")).

A plaintiff asserting false claims satisfies the standard imposed by Rule 9(b) by alleging "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." Foglia v. Renal Ventures Management, LLC, 754 F.3d 153, 157-58 (3d Cir. 2014) (quoting United States ex. rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009)). "Describing a mere opportunity for fraud will not suffice. Sufficient facts to establish 'a plausible ground for relief' must be alleged." Id. (quoting Fowler, 578 F. 3d at 211.)

## II.    FACTUAL BACKGROUND

The record as read in the light most favorable to plaintiffs establishes the background set forth below. Plaintiffs are community-based organizations that advocate for equal a) housing opportunities, b) community development, and c) revitalization in the city of Pittsburgh. HUD is the federal entity responsible for administering programs related to housing and urban development. In accord with the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq*., HUD must administer those programs in a manner that affirmatively will further fair housing. 42 U.S.C. § 3608(e)(5).

HUD offers federally funded grants to support housing and community development in Pittsburgh and other communities. These grants include the Community Development Block Grant ("CDGB") funding[1] and the HOME Investment Partnerships ("HOME") program,[2] both of which endeavor to provide fair housing opportunities for all Americans, particularly "members of disadvantaged minorities." 42 U.S.C. § 12702 and 24 C.F.R. § 91.1. Any grantee for these funds must certify that it will comply with all applicable statutes and regulations in its application for a HUD grant.[3]

Applicants such as the City must submit a consolidated plan to receive these and other types of similar funding. The consolidated plan operates as the grantee's application for funding and includes a certification that CDBG and HOME funds will be disbursed in accord with the FHA and in a manner that will affirmatively further fair housing. 42 U.S.C. § 12702 and 24 C.F.R. § 91.1; 42 U.S.C. § 5304(b)(2) and §§ 12705(b)(3) and (15).

Affirmatively furthering fair housing requires the grantee to (1) "conduct an analysis to identify impediments to fair housing choice within the jurisdiction," (2) "take appropriate actions to overcome the effects of any impediments identified through that analysis," and (3) "maintain records reflecting the analysis and actions in this regard." 24 C.F.R. § 91.225(a)(1).

---

[1] CDBG funding is authorized by Title 1 of the Housing and Community Development Act of 1974, 42 U.S.C. § 5301 *et seq.*, and the regulations promulgated pursuant thereto at 24 C.F.R. § 570.1 *et seq*.

[2] HOME funding is authorized by the HOME Investment Partnerships Act, Title II of the Cranston-Gonzalez National Affordable Housing Act, as amended, 42 U.S.C. § 12701 *et seq.*, and the regulations promulgated thereunder at 24 C.F.R. §92.1 *et seq*.

[3] The recitation of the statutes and regulations governing a HUD grantee's compliance is derived from the statutes and regulations referenced in plaintiffs' amended complaint. Defendants dispute the accuracy of plaintiffs' interpretations of a number of these statutes and regulations. While, at the very least, plaintiff's interpretations appear at times to be based on zealous advocacy, they will be recounted in this background section as asserted by plaintiffs.

Impediments affecting disadvantaged minorities are to be addressed in greater detail with consideration given to all available financial resources. 24 C.F.R. § 91.520(a) and HUD Fair Housing Planning Guide §§ 1.2, 2.2 and 2.7 (Exhibit 1 to Amended Complaint, Doc. No. 34-1).

Recipients of CDBG and HOME funds submit annual and five-year consolidated plans detailing proposed disbursements and certifying compliance with applicable laws and regulations. 42 U.S.C. § 5603(b) and 24 C.F.R. §§ 91.15(b), 91.100 - 91.225. CDBG grantees also certify that "the projected use of funds has been developed as to give maximum feasible priority to activities which will benefit low-and moderate-income families or aid in the prevention or elimination of slums or blight," and agree to comply with other applicable laws and regulations. 42 U.S.C. §§ 5304(b)(3) and (6) and § 3535(d). For example, CDBG funds cannot be used for "expenses required to carry out the regular responsibilities of the unit of general local government" without specific authorization from HUD. 24 C.F.R. § 570.207(a)(2).

CDBG grantees also certify that they are following a citizen participation plan, which provides an opportunity for citizens to comment on proposed housing and community development projects. The plan is to encourage participation by citizens with low to moderate income, who reside in areas experiencing slum or blight or will be affected by the proposal. 42 U.S.C. § 5304(a)(3)(A), (B) and (D) and 24 C.F.R. § 91.105. A compliant citizen participation plan provides adequate public notice of meetings and "reasonable and timely access to local meetings[,] . . . records relating to the grantee's proposed use of funds" and sufficiently detailed information from which citizens can determine how they will be affected by the projects. 24 C.F.R. § 91.220(l)(1)(iv).

A grantee also is to prepare an annual performance report evaluating its progress with respect to the goals stated in its annual and five-year consolidated plans. 24 C.F.R. § 91.520(a).

The grantee is to identify "measurable outcomes" in its consolidated plans to accomplish these goals. 24 C.F.R. § 91.220(e) and the HUD Fair Housing Planning Guide §§ 2.10 and 2.11 (Exhibit 1 to Amended Complaint, Doc. No. 34-1). The performance report compares the grantee's actual and projected "measurable outcome[s]" from its consolidated plans. 24 C.F.R. § 1.520.

Against this backdrop, plaintiffs allege that from at least 2006 through 2014 defendants knowingly submitted false certifications of compliance to HUD in order to obtain CDBG and HOME grant funding.[4] Plaintiffs advance three broad categories of false claims. They contend that defendants falsely certified compliance with obligations to (1) affirmatively further fair housing, (2) maintain and follow a citizen participation plan, and (3) use CDBG funds only for eligible expenditures. Assertedly, defendants falsely have expressly certified compliance with these obligations in each annual application for funding. Plaintiffs also aver that the City falsely has impliedly certified compliance with each drawdown of funds.

Defendants purportedly have falsely certified in each consolidated plan that they were complying with their obligation to affirmatively further fair housing, which includes (1) analyzing and identifying impediments to fair housing choices within the City, (2) taking "appropriate action" to address impediments, and (3) maintaining records of the analysis and actions taken. The false certifications were signed by the Mayor. See, e.g., Exhibit 2 to Amended Complaint, Doc. No. 34-2.

Plaintiff FHP advocates for fair housing on behalf of low income, minority residents. FHP avers that the City has not conducted an analysis of impediments ("AI") to fair housing since 2000. FHP acknowledges that the city updated its 2000 analysis in 2007 and the 2007

---

[4] The original complaint was filed on November 2, 2012. The amended complaint alleged ongoing fraud and extended the false claims period through 2014.

analysis in 2013.  These updates were perfunctory and lacked meaningful analysis.  FHP is not aware of any other analyses during the false claims period.

FHP also alleges that the City has not taken "appropriate actions" to address identified impairments.  Appropriate actions are those with "measurable outcomes" that account for available resources and their anticipated effectiveness.  <u>See</u> HUD Fair Housing Planning Guide Vol. 1 §§ 2.4 - 2.6 (Exhibit 1 to Amended Complaint, Doc. No. 34-1).  Plaintiffs' chief complaint is that the City falsely certified that appropriate actions have been proposed or taken to (1) "address residential racial concentration and the lack of affordable housing in areas not concentrated by race and poverty" and (2) "inequity in amenities available in low income, minority concentrated neighborhoods throughout the City."

Plaintiffs provided multiple examples of the City's alleged failure to take appropriate action to address identified impairments.  Through consolidated planning, the City has identified the lack of "decent, safe and affordable housing, particularly rental housing," for low-income, minority families in areas that are "not low income and minority concentrated."  It also has identified the concentration of governmentally assisted housing, including housing available to citizens displaced by publicly funded projects, in low-income, minority concentrated neighborhoods as an impediment.  This housing is also occupied "in a racially concentrated manner."

The City identified these impairments as early as 2000.  In the February 2007 AI, the City acknowledged that low-income, minority concentrated neighborhoods also have less amenities and services.  The 2013 AI acknowledges that federally assisted housing remains concentrated in low-income neighborhoods, but it did not include any analysis regarding racial segregation, concentration or discrimination.

Several of the City's AI reports falsely reflect that it had appointed FHP to perform various services, including conducting surveys and coordinating with other community housing and human service agencies. In the 2007 AI, the City proposed $500,000 for FHP and other agencies to assess the availability of affordable rental housing for disabled and elderly individuals and $1,500,000 to increase the accessibility of emergency shelters and transitional housing for handicapped individuals by 2009. The City also proposed $1,500,000 for FHP and other agencies to "[m]aintain and support efficient and effective fair housing monitoring, investigation, and enforcement strategies" and $250,000 to "[f]und and support the delivery of fair housing services to at-risk groups and victims of housing discrimination" by 2010. Similarly, the City's 2013 AI suggested that FHP received funding for testing and contract compliance services. The City did not engage FHP for any of these tasks.

The City's AI reports imply that $3,750,000 in CDBG funding was made available to FHP and other agencies who were purportedly engaged to perform these services. FHP did not receive any CDBG funding from 2007 to 2010, but received a mid-year grant of $17,000 in 2012.

In 2008, the City proposed spending $2,000,000 to generate additional affordable housing options for low-income and minority citizens in areas that were not low-income or minority concentrated. Plaintiffs FHP and NCFH aver that no additional affordable housing has been built or marketed to minority citizens outside of areas that are not low income and racially concentrated. Plaintiffs assert that if such housing had been produced, it would generate the production of affirmative fair housing marketing plans.

The City's Urban Development Authority ("URA") creates affirmative fair housing marketing plans when five or more units of housing that is not racially and low-income

concentrated is produced with federal assistance. Affirmative fair housing marketing plans have been included in the City's consolidated annual action plans since 2010. On September 21, 2012, plaintiff NCFH requested copies of marketing plans from 2011. The City did not provide any plans. NCFH and FHP are not aware of any marketing plans since that time.

Plaintiffs allege that the City's evaluation of its performance as stated in the June 30, 2010 comprehensive annual performance report is disingenuous. First, the City claimed to address the lack of economic opportunities in minority neighborhoods through its Mainstreets Program. Plaintiffs NCFH, FUI and HDCG aver that the Mainstreets Program operated exclusively in principally white business districts, except for a neighborhood district experiencing "gentrification and displacement." Second, the City anticipated completion of its AI in 2010. Plaintiffs FHP and NCFH aver that the analysis was not completed. In July 2011, the City responded to a Pennsylvania Right to Know law request by NCFH and confirmed that no AI had been performed since February 2007. Third, the City claimed it had addressed the impediment of "concentrations of low-income persons, minorities and female headed households which lack decent, safe and sound housing that is affordable, which impact neighborhoods in the city" over the past year. Plaintiffs aver that this impediment was not addressed. Finally, the report proposed a $15,000 grant to NCFH to address the City's strategy for promoting fair housing. NCFH was not engaged by the City for this task and did not receive the grant.

The February 2013 AI also recognizes that federally assisted housing is concentrated in low-income neighborhoods. Unlike prior analyses, the AI does not acknowledge that this housing also is racially concentrated and does not contain any analysis regarding racial segregation, concentration or discrimination. The City continues to not propose any measurable outcomes regarding "concentration of assisted housing in areas of low income concentration."

The 2013 AI references, but does not address, the "production of affordable housing and improving ability to afford housing costs." The AI also is devoid of any analysis regarding "whether discrimination has produced more severe conditions and restrictions experienced by racial minorities" and makes "no indication of whether or how affordable housing will be located in non-minority concentrated areas, specific benchmarks to realize this and how this will be marketed."

Plaintiffs also allege that defendants falsely certified that they maintain and follow a citizen participation plan. See 24 C.F.R. § 91.105. First, the City purportedly falsely certified that it makes considerable efforts to encourage involvement by citizens who are to have opportunities to participate in the decision-making process regarding the use of CDBG funding. These include citizens with low or moderate-income or citizens who reside (1) in assisted housing, (2) in areas experiencing blight, or (3) where the use of CDBG expenditures are proposed. Plaintiffs NCFH, HDCG and FUI, whose constituents are members of these groups, aver that the City has not done this and thus the certification is false.

Second, the City's participation plan fails to address how it will minimize residential displacement. A compliant citizen participation plan not only indicates how the grantee will minimize residential displacement, but also provides citizens with access to this information. The City's citizen participation plan designates the Central Relocation Agency of the Housing Authority of Pittsburgh ("CRA") as the entity responsible for addressing residential displacement issues and interested citizens are directed to contact the CRA with inquiries. Plaintiff NCFH, through its executive director Ronell Guy ("Guy"), learned that the CRA has been closed for nearly a decade, leaving the City without an entity responsible for minimizing residential displacement, contrary to its certifications.

Third, the City assertedly falsely certified compliance with its obligation to provide adequate public notice of citizen participation opportunities. As required, the City annually holds two public meetings where citizens can "comment on the need for CDBG assistance in the upcoming fiscal year." Plaintiffs aver that the City's use of small print legal notices does not provide adequate public notice. 24 C.F.R. § 91.105(e)(2). In some instances, the City purportedly failed to provide any notice at all. For example, plaintiffs did not receive notice of any public meetings regarding the City's 2010-2014 comprehensive consolidated plan, and they were unable to find any printed notice or advertisement regarding any such meetings.

Similarly and despite certifications to the contrary, the City does not mail notices of public hearings to community based organizations and non-profits, including plaintiffs NCFH and FHP. FHP attends public meetings held by the City when it has notice of such meetings. For example, the City held a public hearing on its 2012 AI, which included a grant to FHP, but FHP never received notice of that hearing and FHP did not learn that the analysis had been issued until after the comment period had expired.

Fourth, in some instances where citizens were provided with an opportunity to comment, the City allegedly failed to respond to citizens' objections and did not document its reasons for rejecting them. In its 2011 consolidated plan, the City falsely certified that it accepted all commentary from the public hearings held regarding that plan. On August 19, 2010, the City held a public hearing regarding the plan and George Moses, a member of relator HDCG, had submitted a written objection and then made an oral objection to the reallocation of CDBG funds for ineligible expenditures. The City did not respond to Moses' objection and refused to accept his comments. It likewise failed to document the objection or its reasons for rejecting it in the 2011 consolidated plan.

Fifth, the City's draft annual action plans ("AAP") do not provide adequate information for citizen participation and substantially differ from those ultimately submitted to HUD. In other words, the draft AAPs provide insufficient information from which citizens can form an opinion regarding the proposals and the AAPs submitted to HUD falsely reflect that citizens have been given an opportunity to comment on the more specific information contained therein. The draft AAPs typically contain vague information and/or designate the funds as "unspecified allocations to be made by the Mayor, City Council, the City Planning Department and the URA as well as program income from prior years' expenditures" while the final versions generally explain in more specific and concrete detail how the funds will be used.

Plaintiffs highlight multiple examples of instances where the City's draft AAP and its submission to HUD have differed. They note differences in the 2011 draft AAP and the version made available on January 10, 2011, regarding a $1,600,000 unspecified local option and $7,897,859 in proposed CDBG and HOME expenditures. Similarly, the 2012 draft AAP and the version made available on January 11, 2012, differed with respect to the proposed expenditure of $4,345,606 in CDBG and HOME funds. The 2013 draft AAP and the version made available on January 9, 2013, differ regarding a proposal of $5,345,106 in CDBG and HOME funds and $2,670,000 for "neighborhood business and economic development." The 2014 draft AAP and the version made available on April 11, 2014 differ regarding a proposal of $7,123,590 in CDBG and HOME funds.

Finally, plaintiffs allege that a substantial portion of CDBG and HOME funds are expended entirely outside of the citizen participation process. Such funds are either reallocated for other purposes or are designated as "Unspecified Local Options" for distribution by the Mayor, members of City Council, and/or the Department of Planning, without any meaningful

opportunity for citizen commentary or sufficient information regarding these expenditures. Plaintiff NCFH, through Guy, questioned City officials regarding how determinations to reallocate CDBG funding during the program year were made. Officials responded that the Mayor, then Ravenstahl, made these decisions. Plaintiff NCFH avers that CDBG funds have been substantially reallocated at the direction of the mayor without any notice or opportunity for citizens to comment.

In this regard, plaintiffs aver that citizens frequently are deprived of any opportunity to engage in citizen participation regarding the expenditure of HOME and CDBG funds. For example, Sala Udin ("Udin"), a founding member of relator HDGC, was a former board member of the URA. Udin alleges that the URA received substantial amounts of CDBG and HOME funding without any public notice or opportunity for citizens to comment regarding the use of these funds for development projects. Likewise, on July 28, 2010, plaintiff NCFH received $15,000 in CDBG funds without any notice or comment opportunity provided to citizens. Similarly, citizens were not given notice or an opportunity to comment regarding the expenditures of $15,000,000 in CDBG funds at the Southside Works complex or $10,500,000 at the Pittsburgh Technology Center, notwithstanding the City's 2010 performance report to the contrary. By way of further example, on June 4, 2010, the City reallocated $381,200 in CDBG funds for its public works street resurfacing budget without providing citizens with any notice or opportunity to comment.

Plaintiffs also highlight the absence of reasonably available information regarding CDBG and HOME funds. During the mid-2000s, Guy learned that the City had received substantial CDBG and HOME funding, but had failed to disclose information regarding the disbursement of these funds. Guy reviewed the City's citizen participation plan in order to assess why her

organization, NCFH, did not receive adequate information about the funding. Guy learned that the City was not implementing or adhering to the citizen participation plan as represented in its certifications to HUD. From January through July of 2011, NCFH made informal and formal (via Pennsylvania Right to Know Law Act requests) inquiries regarding expenditures of CDBG and other funds because the City did not include this information in its performance reports.

In some instances where the City has provided information regarding these expenditures, the information provided does not satisfy the standards imposed by HUD, which require grantees to include information from which citizens can assess whether and how they will be affected by the proposal. The information also sufficiently must enable them to provide meaningful commentary for the City's consideration. For example, the City's 2011 annual action plan designated $2,047,859 to the City URA for "funding to non-profit and for profit developers for acquisition and rehabilitation of new construction of residential rental housing primarily for low and moderate income households and special populations," but the draft did not indicate where, how and/or for whom these funds were to be used.

The City allegedly also has falsely certified that it is complying with applicable laws, which include the requirement to expend CDBG funds only on eligible activities. From 2006 through 2013, the City assertedly has falsely certified compliance with its obligation not to use CDBG funds for "regular governmental responsibilities." CDBG funds, which are intended to "restore deteriorating lower income neighborhoods," have been diverted to pay for activities that should be funded with tax revenue. Plaintiffs, as entities made up of individuals who reside and work in the City, aver that a substantial amount of CDBG funds have been used for street repaving, bridge repair, municipal building repair, and street lighting and traffic control equipment purchase and repair.

Since at least late 2009, members of plaintiffs NCFH and HDCG have objected to the City's use of CDBG funds for regular governmental responsibilities. Udin, former chair of the city council's budget and finance committee, avers that CDBG funds were intermingled with tax revenue to fund regular governmental expenses without an accounting of how the funds were specifically used. Udin raised his objections with City officials, including the director of planning. Udin also voiced his concerns to Guy and Moses, who also objected to the City's use of CDBG funds for infrastructure costs when the City was formulating its 2005-2009 comprehensive consolidated plan.

In 2010, City councilman Reverend Ricky Burgess, who is not a plaintiff in this action, conveyed to the council that the use of CDBG funds for regular government responsibilities is illegal. On March 15, 2011, Burgess unsuccessfully moved to amend the City's capital and CDBG budget to preclude the use of $2,700,000 in CDBG funding for the local portion of the capital budget. Burgess' efforts to reform the City's expenditure of CDBG funds were the subject of several local news articles. Despite objections from plaintiffs and members of City council, the City allegedly continued improperly allocating CDBG funds for its regular governmental responsibilities, including infrastructure repair. Plaintiffs aver and believe that the amount of CDBG funding used for ineligible expenditures was $2,540,000 in 2008, $1,950,000 in 2009, $4,868,800 in 2010, $5,820,000 in 2011, $3,565,357 in 2012, and $2,682,500 in 2013.

### a. Defendants' Contentions

Defendants move to dismiss plaintiff's amended complaint for lack of subject matter jurisdiction, failure to state a claim, and failure to plead fraud with particularity. They contend that plaintiffs have not stated a claim under the FCA for several reasons. First, this court is deprived of subject matter jurisdiction under the FCA's public disclosure bar because the alleged

fraud has been disclosed and plaintiffs are not original sources. Second, plaintiffs fail to identify

a specific false request for payment or allege a scheme to defraud or intentional plan to disregard

HUD regulations. Third, the allegedly false certifications are not conditions of payment. Fourth,

plaintiffs distort the regulations and statutes purportedly violated by the City. Fifth, plaintiffs

have not pled that the certifications are objectively false. Sixth, plaintiffs have not met the

pleading requirements of Federal Rule of Civil Procedure 9(b), which require a party to plead

fraud with particularity. Seventh, plaintiffs' claims are challenges to policy decisions made by

the City that fall short of identifying conduct actionable under the FCA. Finally, defendants

contend that all claims against the former Mayor should be dismissed as duplicative.

### b. Plaintiffs' Contentions

Plaintiffs counter that the allegations were not publicly disclosed and they are original

sources in any event. Further, the amended complaint complies with Federal Rules of Civil

Procedure 8(a), 9(b), and 12(b)(6). Plaintiffs deny defendants' contention that they have

misstated the statutes and regulations allegedly violated. And they aver that the certifications

were conditions of payment. The certifications objectively were false and knowingly submitted.

Finally, plaintiffs maintain that the City's deficient analysis of impediments, failure to foster and

permit public participation and ineligible uses of CDBG funds establish proper foundations for

seeking redress under the FCA. [5]

### III.   ANALYSIS

The False Claims Act ("FCA") "makes it unlawful to knowingly submit a fraudulent

claim to the government." <u>U.S. ex rel. Schumann v. Astrazeneca Pharm. L.P.</u>, 769 F.3d 837, 840

---

[5] Plaintiffs do not object to the dismissal of Ravenstahl from this action. Accordingly, the claims
against him will be dismissed and the court's analysis will focus exclusively on the claims
against the City.

(3d Cir. 2014) ("Schumann") (citing United States ex rel. Paranich v. Sorgnard, 396 F.3d 326, 331–32 (3d Cir. 2005) ("Paranich"); United States ex rel. Dunleavy v. County of Delaware, 123 F.3d 734, 738 & n. 6 (3d Cir. 1997) ("Dunleavy"); United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1153–54 (3d Cir. 1991) ("Stinson"). Private parties, known as "relators," are permitted to bring *qui tam* suits to enforce the FCA on the government's behalf and to recover a portion of the proceeds from the suit. Schindler Elevator Corp. v. U.S. ex rel. Kirk, 563 U.S. 401, 131 S. Ct. 1885, 1889, 179 L. Ed. 2d 825 (2011) ("Schindler Elevator Corp.") (citing 31 U.S.C. § 3730(b)(1)); accord U.S. ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 305 (3d Cir. 2011) ("Wilkins") (citing 31 U.S.C. § 3730(b) & (d)).

The FCA has been amended twice during the false claims period at issue. The Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted on May 20, 2009, amended the FCA. Wilkins, 659 F.3d at 303. "The pre-FERA version of the FCA, imposed liability on:

> [A]ny person who—
>
> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."

Id. (citing 31 U.S.C. § 3729(a)(1)-(2)).

"The post-FERA FCA incorporates a materiality element and imposes liability on:

> [A]ny person who—
>
> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]"

19

Id. (citing 31 U.S.C. § 3729(a)(1)).

The FERA included "a retroactivity provision which applies only to [the materiality clause in] section 3729(a)(1)(B) and provides that that clause….appl[ies] to all claims under [the FCA] that are pending on or after" the effective date, June 7, 2008. Id. at 303-04 (quoting Pub.L. No. 111–21 § 4(f)(1), 123 Stat. at 1625)).[6]

Plaintiffs allege that the City submitted false claims from 2006 through 2013 ("the false claims period"). The false claims period thus would encompass both the pre- and post-FERA versions of the FCA. Plaintiffs filed their original complaint in 2012 after the post-FERA FCA went into effect. As noted above, the materiality provision is applicable to all claims that are pending after June 7, 2008. Despite the allegation of false claims prior to June 7, 2008, plaintiffs and defendant cite exclusively to the post-FERA FCA and do not allege any substantive difference between the statutes. Accordingly, the court will deem any argument based on a perceived distinction between the two as having been waived and apply the post-FERA version of the FCA to all claims.

The FCA defines a claim as a "request or demand . . . for money or property that . . . is presented to an officer, employee, or agent of the United States." Id. at 303 (citing 31 U.S.C. § 3729(b)(2)(A)(i)). "A statement is 'false' when it is objectively untrue." U.S. ex rel. Thomas v. Siemens AG, 593 F. App'x 139, 143 (3d Cir. 2014) (internal citations omitted). The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." Wilkins, 659 F.3d at 303 (citing 31 U.S.C. § 3729(b)(4)).

_____

[6] The second relevant FCA amendment is discussed in the context of the public disclosure bar, infra.

The FCA does not require "proof of specific intent to defraud."  31 U.S.C. §

3729(b)(1)(B).  It does require that a claim be knowingly presented or made.  "'Knowingly'

includes only 'a defendant's actual knowledge, deliberate ignorance, or reckless disregard of the

truth or falsity of information in the defendant's claim to the government.'"  U.S. Dep't of Transp.

ex rel. Arnold v. CMC Eng'g, Inc., 947 F. Supp.2d 537, 543 (W.D. Pa. 2013) (Bissoon, J.) aff'd

sub nom. U.S. Dep't of Transp., ex rel. Arnold v. CMC Eng'g, 567 F. App'x 166 (3d Cir. 2014)

("Arnold") (quoting U.S. ex rel. Hefner v. Hackensack Univ. Med. Ctr., 495 F.3d 103, 109 (3d

Cir. 2007));  31 U.S.C. § 3729(b)(1)(A) (defining "knowingly" as one who has (1) "actual

knowledge of the information;" (2) "acts in deliberate ignorance of the truth or falsity of the

information;" or (3) "acts in reckless disregard of the truth or falsity of the information.").  The

scienter requirement reflects Congress' "intention that the [FCA] not punish honest mistakes or

incorrect claims submitted through mere negligence."  Id.

### A.  The Public Disclosure Bar

Defendant challenges the existence of subject-matter jurisdiction by way of the public

disclosure bar.  "Federal courts are courts of limited jurisdiction, and when there is a question as

to our authority to hear a dispute, it is incumbent upon the courts to resolve such doubts, one way

or the other, before proceeding to disposition on the merits."  U.S. Dep't of Transp. ex rel. Arnold

v. CMC Eng'g, 745 F. Supp. 2d 637, 642 (W.D. Pa. 2010) (Lancaster, J.)  (quoting Zambelli

Fireworks Mfg. Co., Inc. v. Wood, 592 F.3d 412, 418 (3d Cir. 2010)); accord Arnold, 567 F.

App'x at 168 (addressing public disclosure bar arguments as a preliminary matter "as this

requirement is jurisdictional") (citing Rockwell Int'l Corp. v. United States, 549 U.S. 457, 467-70

(2007)).  Thus, defendant's jurisdictional challenge pursuant to Federal Rule of Civil Procedure

12(b)(1) will be evaluated before considering whether plaintiff has stated a claim that can survive

defendant's challenge pursuant to Federal Rule of Procedure 12(b)(6).

The public disclosure bar was amended during the claims period.  During the initial part of the claims period the public disclosure bar contained a jurisdictional limitation.  "In 1986, Congress amended the FCA to encourage private plaintiffs - relators, in FCA parlance - to bring civil cases if they had information that someone had defrauded the government."  Schumann, 769 F.3d at 840 (citing False Claims Amendments Act (FCAA), Pub.L. No. 99–562, 100 Stat. 3153 (codified at 31 U.S.C. § 3729–33 (1988) [and] Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, 293–95 (2010) ("Graham County")).  But in an effort "'to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits,' Congress added the public disclosure bar to withdraw jurisdiction over . . . suits based on information that had been previously disclosed unless 'the person bringing the action is an original source of the information.'"  Schumann, 769 F.3d at 840 (quoting Graham County, 559 U.S. 280, 293-95 and 31 U.S.C. § 3730(e)(4)(A) (2008)).

The Patient Protection and Affordable Care Act ("ACA"), Pub.L. No. 111–148, § 10104(j)(2), 124 Stat. 119, 901–02 (2010), effective March 23, 2010, amended the FCA's public disclosure bar.  U.S. ex rel. Zizic v. Q2Administrators, LLC, 728 F.3d 228, 232 n. 3 (3d Cir. 2013) ("Zizic").  Prior to the ACA amendment, the FCA ("pre-ACA FCA") provided:

> (4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, 'original source' means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based

on the information.

31 U.S.C. § 3730(e)(4)(A) & (B) (2008).

As amended by ACA, the current public disclosure bar ("post-ACA FCA") states:

(4)(A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

(ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

(iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(A) & (B).

The parties dispute whether the pre- or post-ACA FCA should govern the conduct in question. Plaintiffs argue that the post-ACA FCA should apply to all allegations because they are part of an ongoing course of conduct that continued past March 23, 2010. Defendant contends that the pre-ACA FCA is applicable to all allegations in the complaint because plaintiffs accuse defendant of an ongoing, continued course of conduct that began before the amendment. It fails to cite any authority to support this proposition.

"[T]he legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place." Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 946 (1997) ("Hughes") (citing Landgraf v. USI Film Products, 511 U.S. 244, 265 (1994)).

More specifically, the United States Supreme Court has admonished the lower courts to follow the established "presumption against retroactivity" that governs in the absence of a clear statutory expression of congressional intent to apply an amendment in the FCA to conduct completed before its enactment. Hughes, 520 U.S. at 946-52.

In a case that was argued under the pre-ACA version of the FCA, the Court examined the post-ACA version and noted that '[t]he legislation makes no mention of retroactivity, which would be necessary for its application to pending cases given that it eliminates petitioners' claimed defense to a *qui tam* suit.'" Graham County, 559 U.S. at 283 n. 1 (citing Hughes, 520 U.S. at 948); accord Zizic, 728 F.3d at 232 n.3) (Applying Graham County and finding that the post-ACA FCA is not retroactive and therefore is inapplicable to claims arising before its effective date.).

Moreover, where the complaint contains allegations of conduct both before and after the ACA Amendment, district courts in the Third Circuit have applied the pre-ACA FCA to conduct occurring before the amendment and the post-ACA FCA to conduct occurring after the amendment. See U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC, 69 F. Supp.3d 416, 423 (D. Del. 2014), rev'd on other grounds, 812 F.3d 294 (3d Cir. 2015) (citing U.S. ex rel. Judd v. Quest Diagnostics Inc., Civ. No. 10–4914, 2014 WL 2435659, at *6 (D.N.J. May 30, 2014) ("Judd") ("Here, however, the initial Complaint was filed after the ACA-amended provision took effect, while the pre-2010 conduct alleged in the Complaint occurred while the pre-ACA provision was still in place. Therefore, because the ACA-amended provision is not retroactive, the pre-ACA provision applies to all pre-2010 conduct alleged in this case."); U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co., 2014 WL 4375638 at *7 (E.D. Pa. 2014) ("Victaulic") (applying pre-ACA FCA to conduct occurring before March 23, 2010).

Accordingly, allegations of pre-2010 conduct will be assessed under the pre-ACA FCA and allegations of post-2010 conduct will be assessed under the post-ACA FCA.[7]

There are several pertinent substantive differences between the pre- and post-ACA FCA. In Moore, the Third Circuit examined a number of these differences. Among other things, the ACA amendment "removed the language [in the public disclosure bar] that explicitly stated that a court was deprived of 'jurisdiction' over the FCA action if the bar applied to that action; reduced the number of enumerated public disclosure sources; and expanded the definition of 'original source' by allowing a relator who 'materially adds' to the publicly disclosed information to qualify." Moore, 812 F.3d at 297. Through these changes Congress in effect "overhauled the public disclosure bar." Id. at 299.

Each of these changes was significant. First, the pre-ACA public disclosure bar explicitly divests the court of jurisdiction over cases predicated on allegations based on public disclosures. The post-ACA FCA directs the court to dismiss the action if it is based on public disclosures. Id. at 298-99 (comparing 31 U.S.C. § 3730(e)(4)(A) (2006) ("No court shall have jurisdiction over an action under this section. . . ."), with id. at § 3730(e)(4)(A) (2012) ("The court shall dismiss an action or claim under this section, unless . . . . ")). This directive removed any impediment to the exercise of subject-matter jurisdiction over a FCA claim predicated on information within the public realm. Id. at 299; accord U.S. ex rel. Zwirn v. ADT Sec. Servs., Inc., No. CIV. 10-2639 KSH, 2014 WL 2932846, at *4 n. 2 (D.N.J. June 30, 2014) ("Zwirn")

___

[7] Plaintiffs' contention that the post-ACA FCA is applicable to conduct occurring prior to its effective date of March 23, 2010, is misplaced. "The Supreme Court has twice held that the 2010 FCA amendments are not applicable to cases pending before the effective date of the amendments." Victaulic, 2014 WL 4375638 at *7 (citing Graham County, 559 U.S. at 283 n. 1; Schindler Elevator Corp, 563 U.S. at 404 n. 1). This is more than sufficient authority to separate the conduct into pre- and post-ACA segments and apply the version of the Act in effect when the conduct occurred.

("The revised statute, which applies here, 'deleted the unambiguous jurisdiction-removing language previously contained in § 3730(e)(4) and replaced it with a generic, not-obviously-jurisdictional phrase,' making it 'clear that the public-disclosure bar is no longer a jurisdiction-removing provision.'"); <u>Victualic</u>, 2014 WL 4375638 at *7 ("This Court is persuaded . . . that the deliberate removal of the jurisdictional language from this subsection suggests that Congress intended to change the jurisdictional nature of the public disclosure bar."); <u>United States ex rel. Radcliffe v. Purdue Pharma L.P.</u>, 737 F.3d 908, 916 (4th Cir. 2013) ("<u>Purdue</u>") ("It is apparent, however, that the public-disclosure bar is no longer jurisdictional.").  Consequently, an adjudication of a pleading stage challenge to the amenability to suit based on the public disclosure bar involving post-ACA conduct is to be undertaken pursuant to Rule 12(b)(6) and not Rule 12(b)(1).  <u>Moore</u>, 812 F.3d at 300.

The changes in the burden of persuasion and the scope of review produced by a shift from a scheme barring jurisdiction to one calling for dismissal is in itself significant.  In conducting a Rule 12(b)(1) analysis to assure jurisdiction, "the court may [usually] consider and weigh evidence outside the pleadings," and "[t]he plaintiff has the burden of persuasion to convince the court it has jurisdiction."  <u>Id.</u> at n. 4 (quoting <u>Gould Electronics Inc. v. United States</u>, 220 F.3d 169, 178 (3d Cir. 2000)).  In contrast, in conducting an analysis pursuant to Rule 12(b)(6) "a court generally considers only the allegations in the complaint, accepting them as true, and the defendant bears the burden of showing that the plaintiff has not stated a claim."  <u>Id.</u>

Nevertheless, "the public disclosure bar remains at least a threshold question for dismissal.  The bar's stated purpose of discouraging opportunistic lawsuits would largely be defeated by shifting the entire public disclosure analysis to a later stage of litigation."  <u>Victaulic</u>, 2014 WL 4375638 at *7; <u>cf.</u> <u>Moore</u>, 812 F.3d at 301 ("We must decide [at the pleading stage]

whether 'substantially the same allegations or transactions [of fraud] as alleged in [Moore's] action or claim were publicly disclosed' in any of the enumerated public disclosure sources.") (quoting 31 U.S.C. § 3730(e)(4)(A) (2012)); but see U.S. ex. rel. Beauchamp v. Academi Training Center, Inc., 933 F. Supp.2d 825, 839 n. 23 (E.D. Va. 2013) ("If the public disclosure bar [were] not jurisdictional, then it would be an affirmative defense and would be appropriately addressed at the summary judgment stage."). Accordingly, we will assess the applicability of the public disclosure bar under Rule 12(b)(1) with respect to all alleged conduct pre-dating the ACA amendment; the remaining allegations will be assessed under a 12(b)(6) standard.

The second major change to the FCA brought about by ACA was a modification of the enumerated sources of public disclosure. Congress inserted the word "federal" before the phrase "criminal, civil, or administrative hearing" as well as before the phrase "report, hearing, audit, or investigation." 31 U.S.C. § 3730 §§ (4)(A),(B). As a result, "information that was disclosed in a criminal, civil, or administrative hearing now qualifies as a public disclosure only if the information was disclosed in a federal case to which the government was a party." Moore, 812 F.3d at 299; accord Judd, 2014 WL 2435659 at *5 ("[T]he ACA-amended public disclosure bar is more limited than the pre-ACA version, because the pre-ACA version encompasses allegations in both federal and state fora, while the ACA-amended version is limited to federal fora."). Similarly, public disclosures based on "administrative reports" are now limited to those from the federal government. Moore, 812 F.3d at 301 ("As stated earlier, to be publicly disclosed, the alleged fraud must have been revealed through at least one of three sources: (1) 'a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party'; (2) 'a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation'; or (3) 'news media.'") (quoting 31 U.S.C. § 3730(e)(4)(A)(i)-(iii)). Thus, only

proceedings involving the federal government and federal reports qualify as post-ACA public disclosure sources. Id. at 299 ("information that was disclosed in a federal case between private parties no longer constitutes publicly disclosed information"), 302 n. 9 ("Congress did amend this source so that only 'Federal' reports qualify.").

Third, ACA expanded the definition of an "original source" in § 3730(e)(4)(B). Moore, 812 F.3d at 299. Under the pre-ACA FCA, a relator whose claims are based on publicly disclosed allegations or transactions can overcome the public disclosure bar if he or she "has 'direct and independent knowledge' of the information on which the allegations in the complaint are based." Id. (quoting 31 U.S.C. § 3730(e)(4)(B) (2006)). Post-ACA, an original source must have "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions." Id. (quoting 31 U.S.C. § 3730(e)(4)(B) (2010).

An important aspect of this change is whether the relator must have "direct knowledge" of the fraud to qualify as an original source. Under the pre-ACA FCA, direct knowledge of the fraud is required. Id. (citing United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1160 (3d Cir.1991) (under the pre-PPACA bar a law-firm relator lacked direct knowledge because it had learned of the fraud "through two intermediaries," one of which was "the discovery procedure by which the memoranda [exposing the alleged fraud] were produced"). Post ACA the relator no longer has to possess direct knowledge of the fraud. Id. Instead, the "focus now is on what independent knowledge the relator has added to what was publicly disclosed."

Although the post-ACA FCA public disclosure bar includes several substantive changes, the basic steps of the analysis remain unaltered. Both versions of the FCA require the initial determination of whether the suit is based on publicly disclosed information in one or more of

the enumerated sources.  Under the pre-ACA FCA, a court "must first assess whether the relator's claim is based on publicly disclosed allegations or transactions."  <u>United States ex rel. Atkinson v. Pa. Shipbuilding Co.</u>, 473 F.3d 506, 519 (3d Cir. 2007) ("<u>Atkinson</u>").  This involves a twostep analysis.  <u>Id.</u>  First, it must be determined whether the information was disclosed through one of the sources listed in § 3730(e)(4)(A).  <u>Id.</u>  Second, "[the court] decide[s] whether the relator's complaint is based on those disclosures.  To be 'based upon' the publicly revealed allegations or transactions the complaint need only be 'supported by' or 'substantially similar to' the disclosed allegations and transactions."  <u>Id.</u>  This same twostep inquiry continues to guide post-ACA determinations of "whether substantially the same allegations or transactions [of fraud] as alleged in [the] action or claim were publicly disclosed" so as to trigger application of the bar.  <u>Moore</u>, 812 F.3d at 301.

Defendant avers that the allegations of pre-ACA conduct in plaintiffs' amended complaint are based entirely on public disclosures.  It asserts that the Analysis of Impediments ("AIs"), Annual and Consolidated Action Plans ("AAPs"), and Consolidated Annual Performance Evaluation Reports ("CAPERs") are "administrative reports" because they are created by a local government for submission to a federal entity.[8]  Defendant highlights the availability of the

---

[8] "AIs are not to be submitted to, or be approved by, HUD.  However, HUD could request submission of the AI in the event of a complaint or as part of routine monitoring."  HUD Fair Housing Planning Guide (Exhibit 1 to Amended Complaint, Doc. No. 34-1) at 2-7.  The information in the AI reports are incorporated into a grantee's consolidated plan.  The goals identified in the Consolidated Plan are "carried out through Annual Action Plans."  Grantees review their progress regarding those goals in Consolidated Annual Performance and Evaluation Reports.  <u>See</u> https://www.hudexchange.info/consolidated-plan/consolidated-plan-process-grant-programs-and-related-hud-programs/

The City contends that the AIs are submitted to HUD.  Affidavit of Michael Petrucci, Appendix to Motion to Dismiss Amended Complaint (Doc. No.  40-17) at ¶ 36.

documents on the City's website and in its planning office.[9]

As previously noted, the pre-ACA public disclosure bar divests the court of "subject matter jurisdiction where: (1) there was a 'public disclosure'; (2) 'in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media'; (3) of 'allegations or transactions' of the fraud; (4) that the relator's action was 'based upon'; and (5) the relator was not an 'original source' of the information." Paranich, 396 F.3d at 332.

Under the pre-ACA public disclosure bar, the City's AIs, AAPs and CAPERs are public disclosure sources enumerated in the statute. First, the public documents would qualify as "administrative reports." In U.S. ex rel. Dunleavy v. County of Delaware, 123 F.3d 734, 746 (3d Cir. 1997) abrogated by Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson, 559 U.S. 280 (2010), the court addressed whether a CDBG grantee's annual Grantee Performance Report ("GPR") was an "administrative report" within the meaning of the public disclosure bar. Id. at 740-46. It did not analyze the nature of the report, but instead reasoned that only those administrative reports "originat[ing] with the federal government" would bar suit because Congress included "modifiers which are unquestionably federal in character." Id. at 745. The Supreme Court abrogated Dunleavy in 2010, holding that a "state or local report . . . may trigger the public disclosure bar." Graham County, 559 U.S. at 201.

The Court's interpretation of the terms "administrative" and "report" under the FCA guides the analysis here. The Court examined the plain text of the statute and opined that

---

[9] The City's website offers AI reports for 2007 and 2012, Consolidated Plans and AAPs for 2010 through 2014, and CAPERs from 2010 through 2013. Also available are draft Consolidated Plans for 2015-2019, an AAP for 2015, an AI report for 2015 through 2019. An undated version of the City's citizen participation plan is also accessible. See http://pittsburghpa.gov/dcp/community-development/cdbg.

"administrative" encompassed the "activities of governmental agencies." Id. at 287 (citing

Black's Law Dictionary 49 (9th ed. 2009)). The federal character of the adjectives preceding

"administrative" ("congressional, administrative, or government accounting office") did not limit

the phrase "administrative report" to only those prepared by federal government agencies. Id. at

293. Instead, an "administrative report" includes a report prepared by any governmental entity.

Id. at 283; see also Schindler Elevator Corp., 563 U.S. at 410 ("As we explained in Graham

County, however, those three adjectives tell us nothing more than that a 'report' must be

governmental."). A year later, the Court in Schindler Elevator Corp. examined the meaning of

"report":

> A "report" is "something that gives information" or a "notification," Webster's
> Third New International Dictionary 1925 (1986), or "[a]n official or formal
> statement of facts or proceedings," Black's Law Dictionary 1300 (6th ed.1990).
> See also 13 Oxford English Dictionary 650 (2d ed.1989) ("[a]n account brought
> by one person to another"); American Heritage Dictionary 1103 (1981) ("[a]n
> account or announcement that is prepared, presented, or delivered, usually in
> formal or organized form"); Random House Dictionary 1634 (2d ed.1987) ("an
> account or statement describing in detail an event, situation, or the like").

Id. at 407-08.

Applying the Supreme Court's analysis in Graham County and Schindler Elevator

Corp., it is clear that the AIs, AAPs, and CAPERs prepared by the City are

"administrative reports" within the meaning of the pre-ACA public disclosure bar. The

reports were prepared by a local governmental body as an "official" mechanism for

providing "information" and a "statement of facts." Furthermore, they are prepared at the

direction of and made available for submission to a federal government agency.

Alternatively, the City's reports made available for submission to HUD would

also qualify under the pre-ACA FCA public disclosure bar as "news media" sources.[10]

---

[10] The City's website does not make available the 2000 AI report or Consolidated Plans, AAPs,

Courts in this jurisdiction have held that information obtained through a publicly accessible website can qualify as "news media" under the public disclosure bar. Victaulic, 2014 WL 4375638 at *9 (citing  U.S. ex rel. Repko v. Guthrie Clinic, P.C., No. 04–1556, 2011 WL 3875987, at *7 (M.D. Pa. Sept.1, 2011) ("The court agrees with those courts from other circuits that have found information contained on publically available websites can be public disclosures within the meaning of the FCA."), aff'd, 490 F. App'x 502 (3d Cir. 2012) ("We agree with the District Court's . . . conclusion that the websites . . . constitute public disclosure of information.")).  It generally has been recognized that publicly "accessible websites are available to anyone with an internet connection and a web browser, and access is not restricted.  Though they are not traditional news sources, they serve the same purpose as newspapers or radio broadcasts, to provide the general public with access to information.  They are easily accessible and any stranger to a fraud transaction could discover the relevant information on them." Id.  It follows that the City's submissions prepared for HUD are matters that have been made public through news media.  The AIs, AAPs, and CAPERs were accessible through a public website as they constitute official postings by government entities and are released for public consumption and the monitoring of government activity.[11]

---

and CAPERS prepared prior to 2010.  Thus, the alternative finding that the documents qualify as "news media" is limited to those publicly made available on the City's website.

[11] The extension of "news media" to include information disclosed on publicly available websites is consistent with the Court's interpretation of the public disclosure bar.  "The . . . sources of public disclosure . . . especially 'news media,' suggest that the public disclosure bar provides 'a broa[d] sweep.'" Schindler Elevator Corp., 563 U.S. at 408 (quoting Graham County, 590 U.S. at 290).  Courts from other circuits have also determined that "information contained on publicly available websites can be public disclosures within the meaning of the FCA." Repko, 2011 WL 3875987, at *7 (citing U.S. ex rel Brown v. Walt Disney World Co., No. 6:06–cv1943, 2008 WL 2561975, at *4, *4 n. 7 (M.D. Fla. June 24, 2008); U.S. ex rel. Liotine v. CDW Government, Inc., No.2009 WL 3146704, *6 n. 5 (S.D. Ill. Sep. 29, 2009); United States ex rel. Nowak v.

Defendant advances an identical argument as to all documents made publicly available after March 23, 2010, but acknowledges that the issue of whether the documents would qualify as "administrative reports" under the post-ACA public disclosure bar appears to be an issue of first impression. It reiterates that these documents likewise are prepared for and submitted to HUD, a federal agency, in support of its contention that the reports would still fall under the public disclosure bar's limitation to "federal" sources.

Applying the plain language of the statute, these documents would not qualify as administrative reports under the post-ACA public disclosure bar. At their base, the reports are those of the City. They are not prepared, issued or approved by HUD in the first instance. Without a showing that they have been adopted by HUD, they remain beyond the reach of a federal administrative report falling under the post-ACA public disclosure bar.

Nevertheless, the City's submissions continue to qualify as "news media" sources under the post-ACA public disclosure bar. The post-ACA public disclosure bar did not modify the definition of "news media." All of the documents reflecting post-ACA conduct are generated at the direction of and made available for submission to HUD. They are made available to the public through the City's website. They constitute official postings by government entities and are released for public consumption and the monitoring of government activity. Thus, the

---

Medtronic, Inc., No. 1:08cv10368, 2011 WL 3208007, *45 (D. Mass., July 27, 2011); United States ex rel. Jones v. Collegiate Funding Services, No. 07cv290, 2010 WL 5572825, *31 (E.D. Va. Sept. 21, 2010) (defendants' "SEC filings, which the government required [defendants] to file and which the government disclosed to the public on its website, constituted 'administrative reports' within the meaning of" the FCA); United States ex rel. Davis v. Prince, 753 F. Supp.2d 569, 585 (E.D. Va. 2011) (government report posted on an internet website maintained by an online publication was publicly disclosed); United States ex rel. Barber v. Paychex, Inc., 2010 WL 2836333, *8 (S.D. Fla. July 15, 2010) ("newspaper and magazine articles, . . . securities filings, analyst reports and internet websites - constitute the kind of 'public disclosure' covered by" the FCA).

analysis of whether these publicly available documents qualify as "news media" under the post-ACA public disclosure bar is identical and the conclusion that they do remains unchanged.

The AIs, AAPs, and CAPERs are considered public disclosures pursuant to two of the enumerated sources in the pre-ACA FCA and one of the enumerated sources in the post-ACA FCA. Thus, the first two steps in the disclosure bar analysis have been satisfied as to these documents. Compare Zizic, 728 F.3d at 235 ("Starting out with the first and second elements, we analyze whether 'information was [publicly] disclosed via one of the sources listed in § 3730(e)(4)(A).'") (citing Atkinson, 473 F.3d at 519).

The City also contends that plaintiffs' allegations regarding ineligible expenditures were publicly disclosed via print and online news articles in 2010, two years before the complaint was filed. "News media" unquestionably includes articles disseminated by local newspapers. See United States v. Express Scripts, Inc., No. 14-1029, 2015 WL 728029, at *1 & n. 9 (3d Cir. Feb. 20, 2015) (finding that published news articles were public disclosures falling within the ambit of news media); accord U.S. ex rel. Ryan v. Endo Pharm., Inc., 27 F. Supp.3d 615, 628 (E.D. Pa. June 23, 2014) ("These [news] articles qualify as public disclosures from news media under the plain language of 31 U.S.C. § 3730(e)(4).") & U.S. ex rel. Gohil v. Sanofi-Aventis U.S. Inc., No. CIV.A. 02-2964, 2015 WL 1456664, at *4 (E.D. Pa. Mar. 30, 2015) ("The article was published in the 'news media' making the article a source listed in § 3730(e)(4)(A).") Accordingly, the news articles regarding the City's purportedly ineligible uses and expenditures of CDBG funds are sources of public disclosure and the information regarding the ineligible expenditures advanced by plaintiffs in this regard was publicly disclosed.

With respect to the allegations of ineligible expenditures of CDBG funds after March 23, 2010, these allegations were publicly disclosed through the same news media articles. "[A]

claim can be 'based upon' a public disclosure if the public disclosure concerned similar conduct that occurred in a different time period." U.S. ex rel. Tahlor v. AHS Hosp. Corp., No. 2:08-CV-02042 WJM, 2013 WL 5913627, at *8 (D.N.J. Oct. 31, 2013) (citing United States ex rel. Boothe v. Sun Healthcare Grp. Inc., 496 F.3d 1169, 1174 (10th Cir. 2007) ("Boothe")). "[C]ourts have reject[ed] the contention that a 'time, place, and manner' distinction is sufficient to escape the force of the public disclosure bar." Judd, 2014 WL 2435659 at *8 (citing Boothe, 496 F.3d at 1174). Plaintiffs' allegations that the City used CDBG funds for ineligible expenditures are substantively identical with respect to the periods before and after 2010. "[A]llegations of different time periods of virtually the same scheme do little to take away from their similarity under the public disclosure bar." Id. Thus, the information pertaining to ineligible expenditures were made public through the 2010 new media articles to the extent they reflect the same or a similar course of conduct.

Third, the "court consider[s] whether the information publicly disclosed . . . constituted allegations or transactions of fraud." Zizic, 728 F.3d at 235. The "FCA 'bars suits based on publicly disclosed allegations or transactions, not information.'" Id. at 236 n. 9 (quoting Dunleavy, 123 F.3d at 740 (quoting Wang v. FMC Corp., 975 F.2d 1412, 1418 (9th Cir. 1992) (internal quotation marks omitted)). "An allegation of fraud is an explicit accusation of wrong doing." Id. at 235-36 (citing Dunleavy, 123 F.3d at 741). "A transaction warranting an inference of fraud is one that is composed of a misrepresented state of facts plus the actual state of facts." Id. at 236.

The Third Circuit has created "a formula to represent when information publicly disclosed in a specified source qualifies as an allegation or transaction of fraud:

If $X + Y = Z$, $Z$ represents the allegation of fraud and $X$ and $Y$ represent its essential elements. In order to disclose the fraudulent transaction publicly, the

> combination of X and Y must be revealed, from which readers or listeners may
> infer Z, i.e., the conclusion that fraud has been committed."

Id. (quoting United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 654 (D.C. Cir. 1994) ("Springfield Terminal").  "Thus, the public disclosure bar applies 'if either Z (fraud) or both X (misrepresented facts) and Y (true facts) are [publicly] disclosed by way of a listed source.'"  Id.; accord Moore, 812 F.3d at 303 ("Formulaically this appears as follows: 'X (misrepresented state of facts) + Y (true state of facts) = Z (fraud).") (quoting Dunleavy, 123 F.3d at 741)).

Under this approach "[a] defendant must therefore show that substantially the same 'allegation' of fraud (Z) or 'transaction' of fraud (X + Y) was publicly disclosed through the sources enumerated in § 3730(e)(4)(A)."  Moore, 812 F.3d at 303.  A transaction of fraud requires "of two elements: a misrepresented state of facts and a true state of facts.  The presence of one or the other in the public domain, but not both, cannot be expected to set Government investigators on the trail of fraud."  Springfield Terminal, 14 F.3d at 655.

Plaintiffs allege that the public disclosure bar does not apply because the City's submissions to HUD reveal only "X," the facts misrepresented by the City, and not "Y," the true facts.  According to plaintiffs, the true state of affairs is that the City failed to affirmatively further fair housing because it performed a deficient analysis of impediments, failed to analyze racial discrimination and its effects, and did not identify appropriate actions to overcome those impediments.  The City's certification of compliance thus assertedly misrepresented the fact that it was compliant with its obligation to affirmatively further fair housing.

The City's submissions to HUD create an inference of fraud because they include "X," a purported misrepresentation that the City is in compliance with its obligations to further fair

housing, and "Y" the City's actual identification of impairments and appropriate actions to overcome those impediments. Assuming as plaintiffs' assert that both the impediments to fair housing and actions to be taken to overcome those impediments were deficient and represent the misrepresented state of facts forming the basis for the certification that the City was in compliance with its obligations to affirmatively further fair housing, the "X" was disclosed. But the "Y" necessarily was disclosed as well. The measures that the City actually intended to and did take were disclosed. These deficient measures necessarily reflected the "Y," that the City was not undertaking the analysis and measures that effectively would overcome the impediments to affirmatively furthering fair housing. Thus, the City's AI reports and submissions to HUD publicly disclosed the transaction of fraud with respect to its obligations to affirmatively further fair housing.

The majority of plaintiff's citizen participation claims are not within the scope of the public disclosure bar. According to plaintiffs, the true state of facts is that the City did not encourage citizen participation because it (1) failed to provide adequate notice of meetings to citizens and community organizations, (2) did not document and accept all public commentary, (3) did not hold public meetings regarding the allocation of CDBG funds to the discretion of the Mayor and City council, (4) included additional information in its final AAPs that was not subject to citizen participation, and (5) continued to identify an entity as being tasked with minimizing residential displacement (the CRA) years after it was no longer in existence. Plaintiffs allege that the City's certification of compliance misrepresented the fact that it was complying with its obligation to encourage citizen participation.

The City's submissions to HUD do not create an inference of fraud regarding its compliance with its citizen participation plan because they include only "X," a purported

misrepresentation that the City is in compliance with its obligations to follow a citizen participation plan. The City's submissions to HUD do not include "Y," the true state of facts, with respect to the public notice of meetings and allocations of CDBG funds to the Mayor and City council. The City's submissions prepared at the direction of HUD do not disclose the true state of facts with respect to notice being mailed to community organizations, the absence of documentation of public commentary, or the difference between the information in draft and final AAPs. Thus, the City's submissions to HUD do not publicly disclose a transaction of fraud with respect to the City's obligations to encourage citizen participation.

Finally, plaintiffs' claims regarding ineligible expenditures are within the public disclosure bar. Defendant attached two articles from May of 2010 in support of its contention that the public disclosure bar prohibits plaintiffs' allegations regarding ineligible expenditures of CDBG funding.[12] These articles include explicit accusations of fraud. The articles specifically accused the City of (1) using CDBG funding for ineligible expenditures, including street repaving, paying administrative salaries, and purchasing equipment; (2) improperly allocating CDBG funds to the Mayor and members of the City's council to spend at their own discretion[13] and (3) failing to use CDBG funding for its intended purpose – to aid distressed communities marked by concentrations of race and low to moderate income residents. One of these articles includes a statement from a local HUD officer, indicating that the agency intended to review the

_____

[12] See Brandolph, Adam, "Councilman Says City Is Not Properly Using Federal Grants." TribLIVE.com. May 3, 2010. Accessed March 20, 2015. http://triblive.com/x/pittsburghtrib/news/s_679231.html#axzz3YXhDKB00.

See New Pittsburgh Courier Editorial Staff. "Burgess Introduces Bills on Allocating Bloc [sic] Grants." New Pittsburgh Courier. May 12, 2010. Accessed March 20, 2015. http://newpittsburghcourieronline.com/2010/05/12/burgess-introduces-bills-on-allocating-bloc-grants/.

[13] The public disclosure bar does not bar plaintiffs' claims that CDBG funds were allocated to the Mayor and City Council without any notice or opportunity for citizens to comment.

City's expenditures of CDBG funding. These news media articles include "explicit accusation[s] of wrong doing" and thus publicly disclosed "Z", actual allegations of fraud with respect to the allegedly ineligible expenditures of CDBG funding by the City.

With respect to the allegations of ineligible expenditures of CDBG funds after March 23, 2010, these allegations were publicly disclosed by the news media in the articles discussed above. As previously noted, a claim will fall within the ambit of the public disclosure bar where it is predicated on conduct that is substantially similar to that which already has been disclosed. This is particularly apt where the subsequent course of conduct reflects the same or a substantially similar scheme. Judd, 2014 WL 2435659 at *8 (citing Boothe, 496 F.3d at 1174). As previously noted, "allegations of different time periods of virtually the same scheme do little to take away from their similarity under the public disclosure bar." Id.

Here, plaintiffs' claims are substantively identical with regard to the claims periods before and after 2010. Thus, plaintiffs' allegations of fraud with respect to allegedly ineligible expenditures of CDBG funding by the City have been publicly disclosed.

Finally, the court must determine "'whether the relator's complaint is based on those [public] disclosures.'" Zizic, 728 F.3d at 237 (quoting Atkinson, 473 F.3d at 519); Moore, 812 F.3d at 301 (same). "To be based upon allegations or transactions of fraud, claims need not be 'actually derived from' public disclosures." Zizic, 728 F.3d at 237 (quoting Mistick, 186 F.3d at 385-88)). "Rather, claims need only be 'supported by' or 'substantially similar to' public disclosures." Id.[14]

_____

[14] The pre-ACA FCA "barred actions 'based upon' publicly disclosed transactions or allegations of fraud. Some courts held that this language meant the plaintiff must have 'actually derived' his claims from the publicly disclosed source." Victaulic, 2014 WL 4375638 at *8 n. 9 (citing Purdue, 737 F.3d at 917). The Third Circuit has "long held that to be 'based upon' the publicly revealed allegations or transactions the complaint need only be 'supported by' or 'substantially

Here, the public disclosures, the City's submissions generated at the direction of and made available for submission to HUD and the other qualifying news media reports, not only support the plaintiffs' claims, but also are the basis for those allegations. Absent the public disclosures containing the allegedly false certifications and misrepresented facts, plaintiffs would not be able to advance the claims in the amended complaint. With respect to the news articles regarding claims of ineligible expenditures, as noted above plaintiffs' amended claims virtually are identical to the accusations raised therein. Both the news articles and plaintiffs' averments accuse the City of using CDBG funding for ineligible expenditures, specifically to perform street repair and purchase equipment. Thus, plaintiffs' claims of failing to affirmative further fair housing and ineligible expenditures are substantially similar to and supported by the public disclosures.

"Even if the public disclosure bar would otherwise apply to a claim, it does not when 'the person bringing the action is an original source of the information.'" Zizic, 728 F.3d at 239 (citing 31 U.S.C. § 3730(e)(4)(A)). As noted, ACA brought about significant changes to the definition of original source. As a result, the pre- and post-ACA versions of the FCA require "entirely different" analyses in ascertaining whether a relator can qualify as an original source. Moore, 812 F.3d at 305.

Under the pre-ACA FCA, "a relator must have direct and independent knowledge of either Z, the alleged fraud, or both X and Y, the false and true sets of facts, to qualify under the FCA's original source exception." Schumann, 769 F.3d at 846 (citing Atkinson, 473 F.3d at 519

---

similar to' the disclosed allegations and transactions." Id. (quoting Atkinson, 473 F.3d at 519) (quoting Mistick, 186 F.3d at 385-88) (rejecting "a rule that 'based upon' means actually derived from,' because such a rule would render the original source exception superfluous")). The post-ACA FCA, "which requires only that 'substantially the same allegations or transactions as alleged in the action or claims were publicly disclosed,' appears to codify the Third Circuit's interpretation." Id.

and Springfield Terminal, 14 F.3d at 657)). A relator's knowledge must be "independent from the information readily available in the public domain," which may be far more broad than the enumerated sources qualifying as public disclosure sources. Moore, 812 F.3d at 305 (citing Atkinson, 473 F.3d at 522-23 & 31 U.S.C. § 3730(e)(4)(B) (2012)). In other words, it must be independent of all information readily available in the public domain. Id.

Direct knowledge is "first-hand, seen with the relator's own eyes, unmediated by anything but [the relator's] own labor, and by the relator's own efforts, and not by the labors of others, and . . . not derivative of the information of others." Schumann, 769 F.3d at 845 (quoting Paranich, 396 F.3d at 336 & n. 11). It must be "obtained without any 'intervening agency, instrumentality, or influence: immediate.'" Id. (quoting Atkinson, 473 F.3d at 520 quoting Stinson, 944 F.2d at 1160). "The independent knowledge requirement means that 'knowledge of the fraud cannot be merely dependent on a public disclosure.'" Id. (quoting Paranich, 396 F.3d at 336 (quoting United States ex rel. Hafter v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1160 (10th Cir. 1999)). "[A] relator who would not have learned of the information absent public disclosure [does] not have 'independent' information" under the FCA. Id. (quoting Stinson, 944 F.2d at 1160).

Plaintiffs allege that they are original sources of their claims because of their status as community advocacy groups in the City of Pittsburgh (and the related activities of their individual members). They aver that through this role, they are "directly aware" of whether (1) they receive proposed expenditures of CDBG funding as detailed in the City's reports and documentation prepared for the benefit of and potential submission to HUD, (2) they or their constituents receive notice of public hearings as required by the City's citizen participation plan, (3) the City is fulfilling its obligations to affirmatively further fair housing, including generating

fair housing marketing plans, (4) the City is complying with its citizen participation plan, and (5) the City is spending CDBG funding only on eligible expenditures. Their positions also permit them to interact with constituents who would be targeted for citizen participation and participating in actions aimed at affirmatively furthering fair housing through the use of CDBG and HOME expenditures. They also regularly interact with community leaders who have oversight regarding these processes. As individuals who reside and work in the City, they also are "directly aware" that the City regularly and routinely engages in infrastructure and street repair and that CDBG funding is used for these activities.

Plaintiffs' allegations are insufficient to overcome the pre-ACA public disclosure bar because they have fail to plead direct and independent knowledge of the alleged fraud or its premises. The City's publicly disclosed reports and documentation prepared for the benefit of participating in the HUD programs create the very foundation of plaintiffs' claims failure to affirmatively further fair housing. The news media reported allegations that the City inappropriately had used and was continuing to use CDBG funds for ineligible expenditures. From the City's report and documentation plaintiffs were able to discern that the City was allegedly falsely certifying compliance with its obligations to affirmatively further fair housing. From the news articles plaintiffs were able to discern that the City had refused to refrain from using CDBG funding for ineligible expenditures. In other words, without these public disclosures plaintiffs would be left with virtually no knowledge or information to prove their asserted claims of false certifications of compliance with affirmatively furthering fair housing or the consistent improper use of CBGD and HOME funding. In other words, even when measured against only the qualifying public sources under the pre-ACA FCA, plaintiffs' claims are not based on their own independent knowledge or experience, but rather are derived from their

ability to review the City's reports and documentation prepared in order to participate in the CBGD and HOME funding programs and/or the new media surrounding the City's use of that funding. In short, these claims essentially are derived from the knowledge of others who are involved with the processes.

Furthermore, the Third Circuit has consistently rejected "the argument that a realtor's knowledge is independent when it is gained through the application of expertise to information publicly disclosed under § 3730(e)(4)(A)." Zizic, 728 F.3d at 240 (citing Atkinson, 473 F.3d at 526 n. 27 and Stinson, 944 F.2d at 1160). Here, "the the Relators' knowledge underlying their complaint . . . is 'based on research and review of public records, not, with minor exceptions, [their] own observation[s].'" U.S. ex rel. Lockey v. City of Dallas, 576 F. App'x 431, 438 (5th Cir. 2014) (affirming motion to dismiss because relators alleging FCA violations based on the City of Dallas' false certification that it would affirmatively further fair housing were not original sources) (quoting U.S. ex rel. Reagan v. E. Texas Med. Ctr. Reg'l Healthcare Sys., 384 F.3d 168, 178-79 (5th Cir. 2004)). As such, it fails to clear the independent and direct knowledge requirements needed to gain original source status.

Moreover, "the extent of reliance on information already in the public domain should be a consideration during the original source inquiry, even if that information is not a public disclosure within the meaning of § 3730(e)(4)(A)." Atkinson, 473 F.3d at 522. As the Third Circuit explained in Zizic:

> A relator's knowledge is independent if it does not depend on public disclosures. Significantly, the concept of a public disclosure under § 3730(e)(4)(B) is broader than the concept of a public disclosure under § 3730(e)(4)(A); a public disclosure under § 3730(e)(4)(B) encompasses not only information that is disclosed via the sources enumerated in § 3730(e)(4)(A), but also information that is part of the public domain. This distinction is important. On the one hand, reliance solely on public disclosures under § 3730(e)(4)(A) is always insufficient under § 3730(e)(4)(B) to confer original source status. On the other hand, reliance on

> public information that does not qualify as a public disclosure under §
> 3730(e)(4)(A) may also preclude original source status, depending on the extent
> of that reliance, and the nature of the information in the public domain, as well as
> the availability of information, and the amount of labor and deduction required to
> construct the claim.

Zizic, 728 F.3d at 240 (internal citations and quotations omitted).

Even if the City's reports and documentation prepared for participation in the programs were not public disclosures under § 3730(e)(4)(A), the plaintiffs' allegations remain insufficient to defeat the public disclosure bar because they do not reflect information from original sources, but rather studied extrapolations from the entirety of the publicly available information on the City's use of CBGD and HOME funding. Such studied dissertations fall short of bestowing original source status.

Plaintiffs' pleadings also fall short of clearing the original source exception under the post-ACA FCA. Under the post-ACA FCA, original source status requires "knowledge that is independent of and materially adds to *the publicly disclosed allegations or transactions*." Moore, 812 F.3d at 305 (quoting 31 § 3730(e)(4)(B) (2012) (emphasis in original)). The inquiry is more restricted because among other things the relator's knowledge is not measured against all of the information in the public domain, but instead is measured against only the "information revealed through a public disclosure source in § 3730(e)(4)(A)." Id.

As previously explained, the City's AIs, AAPs, and CAPERs and the news articles surrounding the City's alleged improper use of CDGD funding as well as the eruptions in City council regarding the same continue to be information falling within the "news media" source of public disclosures enumerated in § 3730(e)(4)(A). As such, they provide the backdrop against which plaintiffs' claimed independent knowledge is to be measured.

Although the post-ACA narrows the sources of public information to be considered, it did

not re-define the term "independent."  To be independent, a relator's knowledge "of the fraud cannot be merely dependent on a public disclosure."  Paranich, 396 F.3d at 336-37 (citing Hafter, 190 F.3d at 1160 ("[A] relator who would not have learned of the information absent public disclosure d[oes] not have 'independent' information within the statutory definition of 'original source.'") and Findley, 105 F.3d at 683 ("Independent knowledge is 'knowledge that is not itself dependent on public disclosure.'") (quoting Quinn, 14 F.3d at 656)).  In other words, a relator must have knowledge of the fraud that is separate from the public disclosures under consideration, that is "not dependent" or requiring or "relying on" such disclosures.  Id. at 337 n. 12.

In addition to being independent, a relator's knowledge must "materially add[] to" the publicly disclosed allegations or transactions.  The term "add" means to "put (something) in or on something else so as to improve or alter its quality or nature" and the term "material" is defined as "significant, influential, or relevant."  Moore, 812 F.3d at 306.  "So to 'materially add[ ]' to the publicly disclosed allegation or transaction of fraud, a relator must contribute significant additional information to that which has been publicly disclosed so as to improve its quality."  Id.

The court's task in evaluating the information advanced by the relator is not to conduct a simple comparison of the information publicly disclosed in the enumerated sources with the allegations advanced by the relator.  Moore, 812 F.3d at 306.  After all, the original source exception "comes into play only when some facts regarding the allegation or transaction have been publicly disclosed.  The salient issue, then, is how to distinguish additional but immaterial information from information that 'materially adds' to the publicly disclosed allegation or transaction of fraud."  Id.

Rule 9(b) provides a useful benchmark for measuring when a relator's independent

knowledge "materially adds" to the publicly disclosed information.  Moore, 812 F.3d at 307.  As a general matter, a plaintiff alleging fraud must ground its claim "with all of the essential factual background that would accompany the first paragraph of any newspaper story - that is, the who, what, when, where and how of the events at issue."  Id. (quoting In re Rockefeller Ctr. Props., Inc. Securities Litig., 311 F.3d 198, 217 (3d Cir. 2002)).  As applied to the post-ACA FCA setting, "a relator materially adds to the publicly disclosed allegation or transaction of fraud when it contributes information - distinct from what was publicly disclosed - that adds in a significant way to the essential factual background: 'the who, what, when, where and how of the events at issue.'"  Id.

Plaintiffs have failed to advance allegations that are independent from and materially add to what has been publicly disclosed.  Devlin, 84 F.3d at 361 ("The fact that the relators had evidence of the fraud prior to the public disclosure of the allegations establishes that their knowledge was 'independent.' ").  Essentially all of the information comprising the transaction of fraud as well as the direct accusation of fraud were disclosed through the qualifying reports and other news media sources.

As to post-ACA failure to affirmatively advance fair housing transactions, plaintiffs add that FHP did not receive funding for testing and contract compliance services as was represented in the City's 2013 AI; NCFH's inability to receive copies of the City's marketing plans from 2011 after they were requested in 2012; the representation in the City's 2010 comprehensive annual performance report that it was addressing the lack of economic opportunities in minority neighborhoods through its Mainstreets program when NCFH, FUI and HDCG became aware that the City's Mainstreets program operated exclusively in principally white business districts save one neighborhood that had experienced gentrification and displacement; and the failure of the

2013 AI to (1) contain any analysis regarding racial segregation, concentration of assisted housing in low income areas; (2) address meaningfully the production of affordable housing and the ability to improve the ability to afford housing costs, (3) contain any analysis pertaining to "whether discrimination has produced more severe conditions and restriction experienced by racial minorities" and (4) contain projections about whether affordable housing will be located in non-minority concentrated areas as well as to provide specific benchmarks to realize and market the same.

As to their contentions pertaining to public participation, plaintiffs further aver that neither they nor their constituents received notice of any public meetings regarding the City's 2010-2014 comprehensive consolidated plan and were unable to find any printed notice or advertisement regarding such meetings. Along the same lines, the City awarded a 2012 grant to FHP but it never even received a notice of the hearing where that grant was approved and it did not learn that the analysis had been issued until after the comment period had expired. The City failed to respond to specific written comments and subsequent oral objection made by George Moses to the City's 2011 consolidated plan and then failed to document the objection or its reasons for rejecting it – making its 2011 consolidated plan false when it can to the certification that the City was accepting all commentary from the public hearing regarding that plan.[15]

As to their contentions pertaining to improper use, plaintiffs aver that since 2011 the City's draft AAPs have frequently contained only a vague reference to the way funds will be designated and/or utilized, while the final versions contains more specific but different allocations in

_____

[15] Because it already has been determined that plaintiffs' public participation allegations are not within the scope of the qualifying public disclosures, this supplemental information on public participation is recounted to assure that plaintiffs' post-ACA allegations have been fully considered with regard to the affirmatively furthering fair housing and improper use components of their FCA claim(s).

funding, thereby failing to provide adequate information to foster citizen participation. A portion of CDBG and HOME funding is expended in a manner that is entirely outside the public participation that has occurred, with plaintiff NCFH receiving such funding on one occasion and plaintiffs being able to identify numerous other instances where such funding was used without public participation regarding its ultimate use. Finally, plaintiffs and others personally have raised objections to the City's use of CBGD funding for what is asserted to be general governmental responsibilities.

The vast array of information forming the knowledge of plaintiffs was ascertained by a careful and detailed study of (1) the City's reports and documentation prepared in order to participate in the CBGD and HOME funding programs as well as (2) the City's responses to specific "Right to Know" requests. The use of such funding has been raised in City council meetings and the fallout from the ensuing discussions have been reported in articles and commentary appearing in news media. As to this aspect of plaintiffs' information, which is the lion's share of plaintiffs' information, it fails to amount to "independent knowledge" because it is dependent on the City's activities as reflected in disclosures that qualify as enumerated public disclosure sources. As with the pre-ACA FCA public disclosure bar, under the post-ACA public disclosure bar plaintiffs' studied extrapolations from the qualifying publicly available information on the City's use of CBGD and HOME funding fall short of bestowing original source status.

The balance of information does not materially add to the information that has been publically disclosed. When viewed against the backdrop of information that cumulatively was disclosed at the relevant point in time, plaintiffs do not identify information that adds significant unknown details to the essential factual background of the alleged fraud. To the contrary,

plaintiffs merely advance personal testimonials to minute aspects of what was disclosed in the public disclosures. Such minute aspects of the deficient operations of the City are not accounts of "the who, what, when, where, and how of the alleged fraud" that were not already publicly disclosed. Consequently, plaintiffs are not entitled to evoke the exception to the public disclosure bar under the post-ACA FCA.[16]

It follows that further proceedings on plaintiffs' affirmatively furthering fair housing and improper use components of their pre- and post-ACA FCA claim(s) are precluded by the public disclosure bar.

A. **12(b)(6)**

The City also moves for dismissal for failure to state a claim under Rule 12(b)(6) and the pleading standards of Rules 8(a)(2) and 9(b). "The primary purpose of the FCA 'is to indemnify the government - through its restitutionary penalty provisions - against losses caused by a defendant's fraud.'" Wilkins, 659 F.3d at 304 (quoting Mikes v. Straus, 274 F.3d 687, 696 (2d Cir. 2001) ("Mikes") (citing U.S. ex rel. Marcus v. Hess, 317 U.S. 537, 549, 551–52 (1943)). To

---

[16] In replacing the jurisdictional aspect of the public disclosure bar with one mandating dismissal, Congress necessarily jettisoned this analysis into the realm of Rule 12(b)(6). In doing so, the court no longer has the freedom to weigh and decide what is or is not fact at this stage of the litigation. Nevertheless, the court is charged by statute with dismissing the action if the claim is predicated on information publically disclosed in the qualifying sources and the relator cannot invoke the original source exception. In this regard, plaintiffs do not deny the existence of the qualifying information upon which this analysis is based. Consequently, the court has taken judicial notice of the information: not for the truth of its content, but merely for the purpose of establishing its existence and availability for public consumption. Compare Moore, 812 F.3d at 301 n. 7 ("We also recognize that the defendants attached the two news articles to their motion to dismiss, and that because these articles were not attached to Moore's complaint, a court would not usually consider such evidence in deciding a Rule 12(b)(6) motion. Moore, however, has conceded that these news articles qualify as news media and has not challenged their authenticity, and so we will judicially notice them for the limited purpose of determining 'what was in the public realm at the time, not whether the contents of those articles were in fact true.'") (quoting Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P., 435 F.3d 396, 401 n. 15 (3d Cir.2006)).

state a claim under the FCA a *qui tam* plaintiff must plead sufficient facts to create a plausible showing that the following elements are present: "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." Wilkins, 659 F.3d 295 at 305 (quoting Schmidt, 386 F.3d at 242) (citing Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 182 (3d Cir. 2001) ("Hutchins").

The FCA does not prohibit fraud by anyone who receives money from the federal government; to the contrary, it "only prohibits fraudulent claims that cause or would cause economic loss to the government." Garg v. Covanta Holding Corp., 478 F. App'x 736, 741 (3d Cir. 2012) (quoting Hutchins, 253 F.3d at 179). Thus, although "false claim[s] may take many forms," Wilkins, 659 F.3d at 306 (quoting S.Rep. No. 99–345, at 9 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5274), something more than a funding recipient's improper use of government funding is required to set forth a claim under the FCA. See Sanders, 545 F.3d at 259-60 ("the fraudulent scheme alleged by Sanders did not involve any claim against the government inasmuch as allotment payments are not made on behalf of the United States, but simply are made from the salary of military personnel as they direct") (citing United States ex rel. Costner v. URS Consultants, Inc., 153 F.3d 667, 677 (8th Cir.1998) ("[O]nly those actions by the claimant which have the purpose and effect of causing the United States to pay out money it is not obligated to pay, or those actions which intentionally deprive the United States of money it is lawfully due, are properly considered 'claims.'").

Moreover, false claims are either factually or legally false. Wilkins, 659 F.3d at 305 (citing U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc., 543 F.3d 1211, 1217 (10th Cir. 2008)). A factually false claim involves a misrepresentation of goods or services that the

claimant has provided to the government.  Id.  A legally false claim "is based on a 'false certification' theory of liability."  Id. at 305 (quoting Rodriguez v. Our Lady of Lourdes Med. Ctr., 552 F.3d 297, 303 (3d Cir. 2008), overruled in part on other grounds by U.S. ex rel. Eisenstein v. City of New York, 556 U.S. 928 (2009)).

A legally false claim can be based on an express or implied false certification.  Id. (citing Conner, 543 F.3d at 1217).  A claimant makes an express false certification by "falsely certifying . . . compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds."  Id. (citing Rodriguez, 552 F.3d at 303).

Implied false certification occurs when a claimant submits a claim for payment "without disclosing that it violated regulations that affected its eligibility for payment."  Id.  This is because "the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment."  Id.  (citing Mikes, 274 F.3d at 699); see also United States v. Science Applications International Corporation, 626 F.3d 1257, 1266) (D.C. Cir. 2010) ("Courts infer implied certifications from silence where certification was a prerequisite to the  government action sought.").  Thus, in contrast to reviewing the expressed representations made to the government, an analysis of an implied false certification claim focuses on "the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment."  Id. at 313 (citing Conner, 543 F.3d at 1218).

"As several courts of appeals have held, however, the implied certification theory of liability should not be applied expansively."  Wilkins, 659 F.3d at 307.  In order to state a claim for implied false certification a plaintiff must "allege not only a receipt of federal funds and a failure to comply with applicable regulations, but also that payment of the federal funds was in

some way conditioned on compliance with those regulations." Id. at 307 (quoting Rodriguez, 552 F.3d at 304); accord U.S. ex rel. Sobek v. Educ. Mgmt., LLC, No. CIV.A. 10-131, 2013 WL 2404082, at *3 (W.D. Pa. May 31, 2013) (McVerry, J.) ("The test for a claim based on a false certification theory is whether an alleged violation concerns a 'condition of payment,' i.e., whether such violation 'might cause [the government] to actually refuse payment.'") (quoting Wilkins, 659 F.3d at 309) (citing United States ex rel Conner v. Salina Regional Health Center, Inc., 543 F.3d 1211, 1220 (10th Cir. 2008)). In other words, a plaintiff must set forth a plausible showing with sufficient particularity "that if the Government had been aware of the defendant's violations of the . . . laws and regulations that are the bases of [the] plaintiff's FCA claims, it would not have paid the defendant's claims." Wilkins, 659 F.3d at 307. This requirement is necessary to prevent the FCA from being used as a "blunt instrument to enforce compliance with all . . . regulations rather than only those that are a precondition to payment." Id. (quoting Rodriguez, 552 F.3d at 304) (quoting Mikes, 274 F.3d at 699) (internal quotation marks omitted)).[17]

"In determining whether compliance with a regulation was a condition of payment from the Government, courts have distinguished between regulations which are conditions of participation in the . . . programs and conditions of Government payment of . . . funds." Id. at 309 (citing Conner, 543 F.3d at 1220; Mikes, 274 F.3d at 697) ("Since the Act is restitutionary and aimed at retrieving ill-begotten funds, it would be anomalous to find liability when the

_____

[17] "[T]he Third Circuit has not addressed whether preconditions for payment must be expressly set forth by rule, statute, or other source, or whether such preconditions may be implied." Dale v. Abeshaus, No. 06-CV-04747, 2013 WL 5379384, at *13 n. 71 (E.D. Pa. Sept. 26, 2013) (internal citations and quotations marks omitted); accord Zwirn, 2014 WL 2932846 at *11 (noting a circuit split "regarding preconditions for payment under implied certification theories of liability" and opining that the "Third Circuit does not appear to have joined a side in the split") (citing Dale and Science Applications, 626 F.3d at 1269-70).

alleged noncompliance would not have influenced the government's decision to pay.").

An important distinction is that a condition of participation is "enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program." Id. at 309. In contrast, conditions of payment "are those which, if the government knew they were not being followed, might cause it to actually refuse payment." Id. (citing Conner, 543 F.3d at 1220).[18]

Relying on a false certification theory, plaintiffs here assert that the City submitted express and implied false certifications to HUD in order to obtain CDBG, HOME and other federal funding. Express false certifications of compliance assertedly were made in the consolidated plans and documentation prepared on behalf of and/or for submission to HUD. The City also purportedly made implied false claims through drawdowns or requests for reimbursement made via HUD's Integrated Disbursement and Information System ("IDIS") because these requests implied that the City had complied with the applicable laws and regulations. Plaintiffs do not identify any specific drawdown requests that were in violation of the FCA.[19]

---

[18] In light of the Third Circuit's distinction between conditions of payment and conditions of participation, plaintiffs' reliance on U.S. ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cnty., N.Y., ("Westchester") in support of their contention that the regulations are without further analysis conditions of payment is inapposite. 668 F. Supp. 2d 548, 567 (S.D.N.Y. 2009) (opining that "in the context of a grant applicant for government funds, the distinction between participation and payment collapses."). While the proposition noted in Westchester remains pertinent to a complete failure (or non-feasance) to perform a basic statutory and/or regulatory requirement for a grant to a public entity receiving money for a beneficent public purpose, it is quite a different proposition to apply such a principle cart-blanc where the false claim is predicated on what can at best be characterized as mal-feasance – intentional or otherwise.

[19] The City's argument that plaintiffs must identify specific claims for payment in order to survive a motion to dismiss or meet the particularity standard under 9(b) is unavailing. The Third Circuit has "never have held that a plaintiff must identify a specific claim for payment at

The parties do not dispute that Pittsburgh is "an entitlement community," which means that it receives CDBG funding based on its status as a metropolitan city and its ability to meet other qualifications. The amount of funding an entitlement community receives is determined according to a statutory formula. 24 C.F.R. § 570.3. The City contends that its status as an entitlement community carries with it the consequence that its certifications do not influence the amount of funding it receives and thus as a matter of law the certifications are conditions of participation, not conditions of payment.

Plaintiffs point to several regulations in support of their contention that the identified instances of the City's non-compliance reflect representations that were conditions of payment. In general, 24 C.F.R. § 91.225(a)(1) delineates the certifications that must be made in a grantee's consolidated plan and requires that those certifications be "satisfactory to HUD." This includes a certification that the "grantee will comply with the other provisions of this chapter and with other applicable laws." 42 U.S.C. § 5304(b)(6).

Plaintiffs cite 42 U.S.C. § 5304(b)(2) in support of their claim that defendant's alleged non-compliance with the duty to affirmatively further fair housing was a condition of payment. It provides: "[a]ny grant under section 5306 of this title shall be made only if the grantee certifies to the satisfaction of the Secretary that . . . the grant will be conducted and administered in conformity with the Civil Rights Act of 1964 [42 U.S.C. §§ 2000a *et seq*.] and the Fair Housing Act [42 U.S.C. §§ 3601 *et seq*.], and the grantee will affirmatively further fair housing."

---

the pleading stage of the case to state a claim for relief." Wilkins, 659 F.3d at 308 (citing Fowler, 578 F.3d at 213) (emphasis in original); accord Foglia, 754 F.3d at 153 (rejecting the representative sample standard and finding that "requiring this sort of detail at the pleading stage would be 'one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates.'") (quoting US ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009)).

Plaintiffs also allege that the certifications regarding a grantee's citizen participation plan are conditions of payment. They point out that "[a] grant under 5306 . . . may be made only if the grantee certifies that it is following a detailed citizen participation plan" and that any such plan must meet several statutory and regulatory requirements, including a certification that the grantee is "following a residential anti-displacement and relocation assistance plan." 42 U.S.C. § 5304(a)(3), 42 U.S.C. § 5304(d)(1) and 24 C.F.R. § 91.105(b)(1).

Finally, plaintiffs contend that compliance with the regulation specifying that CDBG funds are not to be used for "general government expenses" also is a condition of payment. 24 C.F.R. § 570.207(a)(2). The receipt of HOME funds assertedly is conditioned on similar certifications of compliance. 24 C.F.R. § 92.150.

The statutory provisions and regulations identified by plaintiffs are enforced through administrative mechanisms established and managed by HUD. Among other things, these administrative mechanisms establish performance criteria used to evaluate a grantee's compliance and provide numerous opportunities for the grantee to correct identified deficiencies in compliance. Repeated deficiencies can lead to sanctions.

For example, if a grantee fails to comply with the performance criteria identified in 24 C.F.R. §§ 570.902 (timeliness of CDBG-funded activities), 570.903 (review to determine if grantee is meeting consolidated plan responsibilities), or 570.904 (equal opportunity and fair housing review criteria), HUD will provide the grantee with an opportunity to provide additional information and demonstrate compliance with the performance criteria. 24 C.F.R. § 570.900(4) & (5). If HUD thereafter finds that the grantee is not meeting the performance criteria, then HUD may require "appropriate corrective or remedial actions," ranging from a warning letter to collection proceedings. 24 C.F.R. § 570.900(6) and 24 C.F.R. § 570.910 (identifying corrective

and remedial actions).  Prior to imposing a "corrective or remedial action," HUD will consider

the recipient's capacity as described in 24 C.F.R. § 570.905 ("In making the determination, the

Department will consider the nature and extent of the recipient's performance deficiencies, types

of corrective actions the recipient has undertaken and the success or likely success of such

actions.") and balance the various factors as reflected in the attendant circumstances.  24 C.F.R.

§ 570.900(6).

　　　The Secretary may impose sanctions if the grantee fails to undertake appropriate

corrective or remedial actions to resolve the performance deficiency.  <u>See</u> 24 C.F.R. § 570.911

(reduction, withdrawal, or adjustment of a grant or other appropriate action), 24 C.F.R. §

570.912 (nondiscrimination compliance), or 24 C.F.R. § 570.913 (other remedies for

noncompliance).  The most severe sanction imposed by HUD is the reduction or termination of

funding.  This sanction is not imposed until HUD provides notice of the "proposed action" and

an "opportunity . . . for an informal consultation."  24 C.F.R. § 570.911(a).  HUD retains a great

deal of discretion in deciding an appropriate sanction.  <u>See</u> 24 C.F.R. § 570.911(b) ("The amount

of the reduction shall be based on the severity of the deficiency and may be for the entire grant

amount.").

　　　A grantee's failure to comply with the nondiscrimination provisions of the Act as

recounted in 24 C.F.R. § 570.602 also is subject to additional remedial mechanisms and process.

Upon a finding of noncompliance the Secretary will provide notice and a "request to secure

compliance."  24 C.F.R. § 570.913.  If the grantee fails to secure compliance within a reasonable

time, the Secretary may (1) recommend the institution of civil proceedings to the Attorney

General, (2) "[e]xercise the powers and functions provided by title VI of the Civil Rights Act of

1964 (42 U.S.C. 2000d)," or (3) exercise the powers and functions provided for in 24 C.F.R. §

570.913 (other remedies). 24 C.F.R. 570.912(a); see also 42 U.S.C. §§ 5309(b), 5311. The "other" remedies include notice and opportunity for a hearing before an administrative law judge and judicial review in federal district court. 24 C.F.R. § 570.913; see also 42 U.S.C. §§ 5309(b), 5311.

The regulatory scheme demonstrates that satisfactory compliance with the regulations applicable to CDBG and HOME fund recipients is a condition of participation. Plaintiffs' attempt to transform the various deficiencies highlighted in the City's eight year administration of the programs under review into a claim based on a complete failure that amounts to a condition precluding payment is unavailing for several reasons.

First, the statutory and regulatory provisions advanced by plaintiff repeatedly call for compliance to a degree that is satisfactory to the Secretary. For example, the statutory mandate in 42 U.S.C. § 5304(b) requires that grants under § 5306 "be made only if the grantee certifies to the satisfaction of the Secretary that" the grantee is in compliance with several requirements pertaining to public participation, anti-discrimination laws, goals aimed at maximizing the projected impact of the funding on certain urban conditions, the overall goals of the statutory program, restrictions on recovering capital costs and so forth. Likewise, the regulatory scheme requires that grantees "resolve the deficiency to the satisfaction of the Secretary" or face further corrective measures or sanctions. 24 C.F.R § 570.900(b)(7). Thus, the statutes and regulations cited by plaintiff contain language that requires "satisfactory compliance" as determined by the Secretary and such congressional and administrative mandates stop short of reflecting an actual condition of payment. Compare Richards, 29 F. Supp.3d 553, 564 (holding that a Section 8 housing assistance payment ("HAP") contract was a condition of payment because it provided that "[u]nless the owner has complied with all provisions of the HAP contract, the owner does

57

not have a right to receive housing assistance payments under the HAP contract."); Wilkins, 659 F.3d at 309 (regulations reflecting conditions for ongoing participation do not establish a basis to state a claim predicated on a condition of payment).

Second, the complexity and breath of community development funding demonstrate that the provisions advanced by plaintiff are conditions of participation. One need look no further than plaintiffs' amended complaint to form an impression regarding the complexity of the regulations. For example, plaintiffs originally alleged that the City was required to conduct a full AI each year. The Fair Housing Guide, Exhibit 1 (Doc. No. 34-1) to plaintiffs' complaint, clearly indicates that once the initial AI is completed, grantees may "update their AI at least once every 3 to 5 years (consistent with the Consolidated Plan cycle)." Exhibit 1 (Doc. No. 34-1) at 2-6 ("Entitlement jurisdictions that have previously completed an AI and have begun taking actions to address any identified impediments are not required to complete a new analysis at this time. Instead, those jurisdictions are encouraged to update their AIs consistent with [the Fair Housing Planning Guide.]"). Similarly, a review of the scope and breadth of the grant program under which the CDBG and HOME funding is administered demonstrate that the funding is conditioned on the need to meet numerous requirements and address multiple social, economic, and environmental evils that have surfaced in the modern urban environment. See 42 U.S.C. § 5310 et seq. The regulations seeking to implement that program equally are complex and extensive. See 24 C.F.R § 570.1 et seq. The complexity and breadth of the programs and the numerous goals to be accomplished almost assure that a grantee on the level of the City will face various instances of non-compliance from time-to-time. Such complexity and multiple objectives signal that compliance is a condition of participation. Cf. Wilkins, 659 F.3d at 310 ("we think that anyone examining Medicare regulations would conclude that they are so

58

complicated that the best intentioned plan participant could make errors in attempting to comply with them.").

Third, HUD has established extensive administrative mechanisms for managing and correcting deficient performances and noncompliance violations, which include remedies for violations other than the withholding or repayment of grant funding. The regulatory scheme provides for annual review (or more frequently if deemed appropriate by the Secretary) for compliance with (1) the primary and national objectives of the Community Development Act, 24 C.F.R. § 570.901, (2) the timely performance of CDBG-funding activities, 24 C.F.R. § 570.902, (3) the achievement of consolidated plan responsibilities, 24 C.F.R. § 570.903, (4) the requirements to administer the grant in accordance with equal opportunity and fair housing criteria, 24 C.F.R. § 570.904, (5) the grantee's ability to continue to carry out CBGD funding activities in a timely manner, 24 C.F.R. § 570.905, and (6) the general compliance by all government entities in an urban county, 24 C.F.R. § 570.906. The regulations vest the Secretary with the ability to initiate a wide array of actions upon the finding of a deficiency, including the issuance of a letter of warning, calling for the submission of proposals for correction, issuing a schedule governing the implementation of corrective measures, implementing management and responsibility assignment plans, precluding the future receipt of funding based solely on certification, suspending funding for any identified deficient activity, mandating reimbursement and reprogramming for any amounts improperly expended, changing the method of receipt from a letter of credit to reimbursement, and instituting collection proceedings as to certain recipients. 24 C.F.R. § 570.910. The regulations likewise provide for extensive review and interaction as part of the Secretary's determination of appropriate corrective and remedial measures. 24 C.F.R. §§ 570.911-13. Such a scheme provides strong support for the notion that the government

considers compliance to be a condition of participation and does not expect ongoing mistake-free compliance as a condition to receiving each segment of funding.  Cf. Wilkins, 659 F.3d at 310 ("Further, considering that the Government has established an administrative mechanism for managing and correcting Medicare marketing violations which includes remedies for violations other than the withholding of payment otherwise due, it is clear that, although the Government considers substantial compliance with the marketing regulations 'a condition of ongoing Medicare participation, it does not require perfect compliance as an absolute condition for receiving Medicare payments for services rendered.'") (quoting Conner, 543 F.3d at 1221).

Fourth, the regulatory scheme does reflect separate considerations for entitlement communities such as the City when it comes to deficiencies and subsequent remedial measures. Past violations are to addressed in a manner that affects funding in a succeeding year.  See 24 C.F.R. §§ 570.910(b)(8), 570.911(b).  The Secretary may condition the use of funds from a succeeding year upon an appropriate corrective action.  24 C.F.R. § 570.910(b)(8).  After informal consultation and notice and an opportunity to be heard, and consistent with the general process outlined  in 24 C.F.R. § 570.900(b), the Secretary may "make a reduction in the entitlement . . . grant amount either for the succeeding program year or, if the grant had been conditioned, up to the amount that had been conditioned."  24 C.F.R. § 570.911(b).  Thus, the regulatory scheme incorporates a forward-looking approach as to corrective measures needed for an entity such as the City to meet deficiencies and attain compliance.

The Third Circuit has cautioned against reading the FCA in a manner that would make every violation of a complex regulatory scheme into a fraud claim.  See Wilkins, 659 F.3d at 310 (like other courts, "we question the wisdom of regarding every violation of a Medicare regulation as a basis for a *qui tam* suit.") (citing Conner, 543 F.3d at 1221 and Mikes, 274 F.3d at 699-700).

Where there are extensive regulatory measures for maintaining compliance within a complex regulatory scheme and a federal bureaucracy statutorily charged with implementing that scheme, using the FCA to regulate performance carries with it the consequence of shifting enforcement of the scheme to the courts at the expense of losing the expertise of the federal agency. Id. at 310-11 ("In the circumstances, we believe that by permitting *qui tam* plaintiffs to file suit based on the violation of regulations which may be corrected through an administrative process and which are not related directly to the Government's payment of a claim, courts unwisely would shift the burden of enforcing the Medicare regulations to themselves even though the administration of the vast and complicated Medicare program is best left to the administrators.). Such an approach has the potential to extend the FCA far beyond its intended purpose. Id. at 311.

Moreover, recognizing the non-compliance raised by plaintiffs as stating a claim under the FCA would short-circuit the very remedial process Congress saw fit to implement with the expansive and multi-purposed community development funding in question. Permitting such an end run around the corrective process and remedial measures governing a government entity's receipt of such funding would at the very least be a curious application of the FCA. Cf. id. at 310 (""It would . . . be curious to read the FCA, a statute intended to protect the government's fiscal interests, to undermine the government's own regulatory procedures.") (quoting Conner, 543 F.3d at 1222). Given these circumstances, we decline plaintiffs' invitation to venture down such a path.

Against this backdrop plaintiffs' reliance on Westchester is unavailing. In Westchester, the plaintiffs alleged that the county, a recipient of CDBG funding, "knowingly submitted false certifications that it would affirmatively further fair housing by, *inter alia*, failing to analyze impediments to fair housing choice within the County in terms of race." 668 F.Supp.2d at 551.

The defendant in <u>Westchester</u> contended that there was "no legal obligation to consider race when it analyzed impediments to fair housing in connection with its certifications." <u>Id.</u> at 550.

Plaintiff avers that the only factor distinguishing its claims from those in <u>Westchester</u> is that the City has not conceded its failure to analyze racial impediments. In an attempt to analogize this case to <u>Westchester</u>, plaintiffs baldly assert that the City failed to consider or analyze the effect of race and race discrimination in identifying impediments to fair housing or to take appropriate actions to overcome these impediments, contrary to the City's certifications. But plaintiffs' complaint acknowledges several racially driven impediments identified by the City in its AI reports. And as previously noted, <u>Westchester</u> involved non-feasance of the statutory mandate to analyze the impediments to fair housing that are related to race. The County of Westchester did not undertake that analysis and instead simply opted to conduct an analysis that focused solely on the availability "affordable housing."

In contrast, the information properly within the court's current review demonstrates that the City did undertake at various times to analyze all of the impediments mandated for maintaining its participation in the funding programs. What plaintiffs complain about is the frequency and thoroughness of the City's ongoing assessments in this and the related areas. Such undertakings and perceived shortcomings are sufficient to remove plaintiffs' allegations from the realm of setting forth a plausible showing of violating a condition of payment and place them in the category of conditions of ongoing participation. The correction of these conditions of participation is committed to the sound discretion of HUD.

Plaintiffs also argue that the "existence of an administrative enforcement mechanism does not preclude the possibility of an FCA claim." <u>Sobek</u>, 2013 WL 2404082 at *4 (citing <u>United States ex rel Onnen v. Sioux Falls Indep. Sch. Dist.</u>, 688 F.3d 410, 414-15 (8th Cir. 2012)); <u>see</u>

also United States ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1176 (9th Cir. 2006)). This is true.  The court in Sobek also observed that in general whether a defendant has "complied with/and or did not knowingly violate . . . the regulations . . . is a fact intensive defense" which in that case did "not justify dismissal at the pleading stage."  Sobek, 2013 WL 2404082 at *4 (citing Onnen, 688 F.3d at 414-15).  But Judge McVerry aptly opined in Sorek that "[t]he scope of regulatory requirements and sanctions may affect the fact-intensive issue of whether a specific type of regulatory non-compliance resulted in a materially false claim for a specific government payment."  Id. (citing Wilkins).  And it is this aspect of Sobek that exemplifies in application why HUD, and not this court, is the entity that must address the City's allegedly deficient compliance with the statutory and regulatory authority governing community development funding.

In order to avoid turning the FCA into "a blunt instrument to enforce compliance with all regulations," a plaintiff proceeding under an implied certification theory "must show that if the Government had been aware of the defendant's violations of the [] laws and regulations that are the bases of a plaintiff's FCA claims, it would not have paid the defendant's claims."  Wilkins, 659 F.3d at 307 (citing Conner, 543 F.3d at 1219–20 ("If the government would have paid the claims despite knowing that the contractor has failed to comply with certain regulations, then there is no false claim for purposes of the FCA.")).  At this stage plaintiffs are required to set forth a factual showing with particularity that reflects a plausible showing of entitlement to relief under this legal paradigm.  They have failed to do so.  Consequently, the City's motion to dismiss for failure to state a claim must be granted as to all the categories of plaintiffs' FCA claim for this

reason as well.

## IV.    CONCLUSION

For the reasons set forth above, defendant's motion to dismiss plaintiffs' amended

complaint will be granted.  An appropriate order will follow.

Date: March 31, 2016

s/David Stewart Cercone<br>
David Stewart Cercone<br>
United States District Judge

cc:     Donald Driscoll, Esquire
        Kevin Quisenberry, Esquire
        Michael A. Comber, Esquire
        John C. Hansberry, Esquire
        Lourdes Sanchez-Ridge, Esquire

        (*Via CM/ECF Electronic Mail*)