IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE UNITED STATES ex rel., FREEDOM UNLIMITED, INC., NORTHSIDE COALITION FOR FAIR HOUSING, INC., THE HILL DISTRICT CONSENSUS GROUP, INC., and the FAIR HOUSING PARTNERSHIP OF GREATER PITTSBURGH, | Civil Action No. 12-cv-01600 Hon. David S. Cercone |
| Plaintiffs, | |
| v. | |
| THE CITY OF PITTSBURGH, PENNSYLVANIA and LUKE RAVENSTAHL, ITS CHIEF EXECUTIVE OFFICER, | |
| Defendants. | |

THE CITY OF PITTSBURGH'S RESPONSE TO THE UNITED STATES' STATEMENT OF INTEREST REGARDING THE COURT'S ORDER DISMISSING THIS CASE

The United States'[1] Statement of Interest (Dkt. No. 80) does not cite a single False Claims Act case involving HUD's Community Development Block Grant Program ("CDBG"), and misses the opportunity to advance the Government's "keen interest in the development of FCA law and in the correct application of the law in this case, as well as similar cases." (Dkt. No. 80 at 8.) This case involves a mandatory Congressional grant, intended to combat some of the critical problems facing urban communities by providing flexible, reliable, long-term funding. (*See* Dkt. No. 71 at 6-8, 49-63.) The City of Pittsburgh (the "City") is an entitlement community, which means it receives CDBG funding based on its status as a metropolitan city, and the amount of funding is determined according to a statutory formula. (*See id*. at 54.) This case does not involve non-conforming goods or services: this is not a "sand

---

[1] The United States is hereafter referred to as the Government.

instead of sugar, rye instead of coffee . . ." type of case. (Dkt. No. 80 at 9-10.) This case does not involve a reimbursement program, such as the healthcare or educational services programs cited by the Government. (*Id.* at 13-15.) Nor is this a case, as the Government describes it, about "open and integrated residential housing patterns." (*Id.* at 13.) Such an argument thoroughly misstates both the language of the certifications and the clearly-stated Congressional objectives at issue in this case. Because the Government fell back on a boilerplate recitation of general FCA principals and avoided the analogous cases that considered the CDBG program in an FCA context,[2] its Statement of Interest provides no insight or basis for reconsideration.

I. <u>Statutory Purposes and Requirements for Participation</u>

Forty years ago, Congress declared that "the Nation's … urban communities face critical social, economic, and environmental problems." 42 U.S.C. § 5301(a). To address those problems, Congress created the CDBG program, which is primarily aimed at "the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income." 42 U.S.C. § 5301(c). A second purpose of the program, according to Congress, is "to further the development of a national urban growth policy by consolidating a number of complex and overlapping programs of financial assistance to communities of varying sizes and needs into a consistent system of Federal aid which [among other elements …] provides assistance on an annual basis, with maximum certainty and minimum delay, upon which communities can rely in their planning." 42 U.S.C. § 5301(d)(1). Last, to further ensure consistent long-range planning,

---

[2] Relators' condition of payment position relies exclusively on *United States ex rel. Anti-Discrimination Center of Metro New York, Inc. v. Westchester County*, 495 F. Supp. 2d 375 (S.D.N.Y. 2007). *Westchester* involved a grant applicant to the same CDBG program at issue here. The *Westchester* relator challenged the same AFFH certification at issue here under FCA principles. This Court accurately distinguished the *Westchester* facts (nonfeasance v. malfeasance) applying FCA analysis. (*See* Dkt. No. 71 at 61-62.) Yet the Government failed to make any mention of *Westchester* or the decisive rationale in its Statement of Interest.

Congress declared that larger metropolitan cities (like the City) are deemed to be "entitlement communities," which means the City annually receives an amount determined by a statutory formula. (Dkt. No. 71 at 54.)

Any grantee for these funds must certify that it will comply with all applicable statutes and regulations in its application for a HUD grant. (*See id*. at 6.) Applicants such as the City must submit a consolidated plan to receive funding. (*See id*.) The consolidated plan operates as the grantee's application for funding and includes a certification that CDBG funds will be disbursed in accordance with the Fair Housing Act and in a manner that will affirmatively further fair housing. (*See id*.) Affirmatively furthering fair housing – or "AFFH" – requires the grantee to (1) "conduct an analysis to identify impediments to fair housing choice within the jurisdiction," (2) "take appropriate actions to overcome the effects of any impediments identified through that analysis," and (3) "maintain records reflecting the analysis and actions in this regard." (*Id*. (citing 24 C.F.R. § 91.225(a)(1)).) "Impediments affecting disadvantaged minorities are to be addressed in greater detail with consideration given to all available financial resources." (*Id*. at 7 (citing 24 C.F.R. § 91.520(a) & HUD Fair Housing Planning Guide §§ 1.2, 2.2. & 2.7).)

CDBG grantees also certify that they are following a citizen participation plan. (*See id*.) "A compliant citizen participation plan provides adequate public notice of meetings and 'reasonable and timely access to local meetings … records relating to the grantee's proposed use of funds," and sufficiently detailed information from which citizens can determine how they will be affected by the projects.'" (*Id*. (quoting 24 C.F.R. § 91.220(l)(1)(iv).)

II.  Two of Relators' Three Categories of Claims Are Completely Barred By the Public Disclosure Provision

The Government seeks reconsideration only "to the extent such claims are not barred by the FCA's public disclosure provisions." (Dkt. No. 80 at 8.) The Court has properly determined that the ineligible expense and AFFH claims are barred in their entirety by the public disclosure provision. (*See* Dkt. No. 71 at 49.) Accordingly, because these two claims were dismissed with prejudice on multiple grounds, the Court should not revisit its decision for what would be, at most, a purely advisory opinion.

There is no reason (or request, really) for reconsideration of the ineligible expense and AFFH claims in the current circumstances.

III.  There Is No "Garden Variety" Claim for Nonconforming Goods in This Case

Even if the ineligible expense claim was not barred (as it is), dismissal pursuant to Rule 12(b)(6) was proper and the Government's non-conforming goods argument has no application to this program, these regulations, or the allegations in this case. The Government argues that, if it is true that city-wide street paving, bridge repairs, municipal building repairs, and streetlight and traffic control purchase and repair are ineligible activities, then Relators' allegations present a garden variety nonconforming goods or services claim that is actionable under the FCA. (*See* Dkt. No. 80 at 9-10.) The argument fails for at least the following reasons.

*One*, according to the Government, HUD set forth a clear and complete list of CDBG eligible and ineligible activities at 24 C.F.R. §§ 570.201-207. (*See id*. at 10.) This is not true. We need look no further than the five activities listed above, none of which are listed as eligible or ineligible anywhere in the regulations. The cited regulations do not show, clearly or otherwise, whether any of the five activities would be eligible in this case or any similar case.

*Two*, the regulation provides that where, as here, an activity is not *per se* eligible or ineligible, then eligibility will be determined using a variety of factors. *See* 24 C.F.R. § 570.200(a). HUD must specifically determine whether an activity meets one of the following national objectives: the benefit of low- and moderate-income persons; the prevention or elimination of slums or blight; or addressing community development needs having a particular urgency because existing conditions pose a serious and immediate threat to the health or welfare of the community for which other funding is not available. *See* 24 C.F.R. § 570.200(a)(2). In addition, HUD must determine, over a one, two, or three-year period, as selected by the grantee, that not less than 70 percent of CDBG funds will be used for activities benefitting low- and moderate-income persons. *See* 24 C.F.R. § 570.200(a)(3). And then HUD must determine compliance with a myriad of requirements, including AFFH, citizen participation, and the provisions of Sections 201-207. In other words, a determination of whether an activity is eligible requires an analysis of how multiple factors may apply, and can be factually intensive and unique for each activity. The Statement of Interest does not engage in or discuss the relevant analysis of the CDBG program, and the mere "if true" suggestion does not advance the case law in this case or any similar case.

*Three*, the hallmark of the CDBG program is flexibility to address critical social and economic problems facing urban communities (*see* 42 U.S.C. § 5301(a), (b) & (d)), recognizing that the CDBG program provides communities with resources to address a wide range of unique community development needs. Entitlement communities like the City receive annual grants to develop viable urban communities by providing decent housing, a suitable living environment, and opportunities to expand economic opportunities, principally for low- and moderate-income persons. By definition, the flexibility mandated by the CDBG program

provides for flexible decision-making by the grantee; the constrictive "list" interpretation offered by the Government would cut against the very purpose of the CDBG program.

*Last*, the five activities at issue here are completely distinguishable from every one of the nonconforming goods cases cited by the Government (sand instead of sugar, rye instead of coffee, brown paper instead of leather, etc.) (*See* Dkt No. 80 at 9-10.) This is true for one simple reason: under the CDBG program and the statutes, regulations, and guidance governing that program, the Government does not request any particular activity or goods from the City; rather, the CDBG statute broadly declares national purposes and directs the City, along with all other entitlement communities, to develop plans and strategies to achieve those purposes and report on their progress. In short, the "garden variety" cases cited by the Government have no application to the CDBG program, the five activities, the applicable statutes, regulations, and guidance, or Relators' ineligible expense claims.

IV.     The False Certification Arguments Fail

The Government's false certification analysis (Dkt. No. 80 at 10-16) is similarly flawed, and none of its arguments in that section merit reconsideration.

At the outset, the Government failed to properly distinguish funding (the grant) from payments (for activities), or recognize the manner in which CDBG, HOME, and related federal funds are disbursed. As the Court correctly noted, the grant amount is determined according to a statutory formula, not any request or submission from the City, and the amount of the grant is not tied to any of the certifications at issue. (*See* Dkt. No. 71 at 54) Rather, the City's Annual Action Plans ("AAPs") – including the certifications – serve as the applications to participate in the CDBG program and, going forward, to use grant funds in various ways; and subsequently to draw down from what is essentially a line of credit. (*See id*. at 6-7.) Often, CDBG funds from one funding year are spent over several years on hundreds of projects

throughout the City to address the four national purposes. The certifications are, therefore, conditions for participating in the CDBG program in the upcoming program year, not requests to be paid any particular amount of CDBG funds.

The CDBG program is not comparable – in any material way – to the Medicare realm, where healthcare providers request reimbursement from and actually bill the Government for services or procedures that have already been completed. *See*, *generally*, 42 U.S.C. § 1395 *et seq*. Similarly, the CDBG program is distinguishable from the case of Medicare Advantage, where healthcare providers receive a set amount of money based on information submitted by the providers. *See United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 299 n. 4 (3d Cir. 2011).[3] By contrast, CDBG grantees like the City have no say in the amount of CDBG money they will receive each year. For these reasons, any analogy to Medicare reimbursement fraud fails.

*Second*, while the City may only submit a handful of certifications, those certifications incorporate a vast and complex network of statutes, regulations, and administrative guidance, as the Court observed. (*See* Dkt. No. 71 at 58-59.) The City's "compliance" with those certifications can only be evaluated by referring to and interpreting a much larger framework of purposes and objectives that impact a vast array of City activities.

For example, to determine if the City took adequate steps to "affirmatively further fair housing," HUD would consider, among other things, the larger goals of the CDBG program (as listed and defined in the Housing and Community Development Act of 1974), the definitions in the relevant regulations (including 24 C.F.R. § 91.225), and the extensive guidance authored

---

[3] *See also United States v. Scan Health Plan*, No. CV 09-5013-JFW, 2013 U.S. Dist. LEXIS 129656, at *6-7 (C.D. Cal. July 30, 2013) (comparing Medicare's fee-for-service model to Medicare Advantage's capitated, per-member-per-month payments)

by HUD, including the 100-page "Fair Housing Planning Guide" (*see* Dkt. No. 1-1), as well as – eventually – all of the City's relevant actions over multiple years, as documented in its lengthy Analysis of Impediments Reports, Five-Year Consolidated Plans, AAPs, CAPERs, and budgets. (*See*, *generally*, Dkt. No. 71 at 6-8, 58.) Likewise, any analysis of the City's citizen participation plan requires an understanding of a stream of federal regulations (including 24 C.F.R. § 91.105), which dictate everything from the number of public hearings the City must hold, to the manner in which records must be stored, to the procedure for receiving citizen comments. (*See id*.)

Weighing whether a certain community did (or intends to do) "enough" in a given year (which is Relators' only plausible claim here with respect to both citizen participation and AFFH) depends on a myriad of factors, and the experienced consideration of the complex legal framework described above. For the reasons stated in the Court's March 31 Opinion, HUD is best suited to make that assessment; the administration of the vast and complicated CDBG program is best left to administrators. (*See id*. at 61.)

*Third*, there is a wide range of "appropriate corrective or remedial actions" available to HUD for any "performance deficiency"; everything from a "warning letter" to "reduction or termination of funding." (*Id*. at 55-56.) The Government's argument rests on the fact that this wide range includes the withholding or termination of grant funds (Dkt. No. 80 at 11), which is neither a new fact nor a persuasive one. Certainly, HUD can impose such a sanction. But the "withholding or repayment of grant funding" is the most drastic of the many "corrective measures" at HUD's disposal and tantamount to termination of participation. (Dkt. No. 71 at 59.) The existence of other, lesser sanctions, and the "extensive administrative mechanisms" employed by HUD to manage and correct a grantee's performance, demonstrate that HUD "does not expect ongoing mistake-free compliance" as a condition of payment. (*Id*. at

59-60.) The Court previously and carefully discussed that fact, and as the Government's argument merely rehashes one of Relators' old points, it should be rejected. *See*, *e.g.*, *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010) (reconsideration is not appropriate where the movant "advance[s] the same arguments" that were previously presented to the court).

*Fourth*, in describing the purpose behind the CDBG program, the Government paints an overly simplistic picture. (*See* Dkt. No. 80 at 12.) Contrary to the Government's argument, and as noted above, the CDBG program is not aimed solely at AFFH and citizen participation. The CDBG program has much broader goals and demands that grantees balance multiple objectives in allocating, leveraging, and maximizing federal dollars. *See* 42 U.S.C. § 5301(c) (listing nine "specific objectives" of the program); *see also* 24 C.F.R. § 570.200(a)(2) (CDBG dollars should be used on "activities which will carry out one of the national objectives"). In fact, HUD's own website describes CDBG as "a flexible program that provides communities with resources to address a wide range of unique community development needs." Community Development Block Grant Program, http://portal.hud.gov/hudportal/HUD?src=/program_offices/comm_planning/communitydevelopment/programs (last visited May 27, 2016). The CDBG program is not restricted to "open and integrated residential housing patterns," as the Government argues. (Dkt. No. 80 at 13.) In fact, that language is not even part of the AFFH certification. The creation of "fair housing" and the analysis of impediments (including racial bias) are certainly components of the current CDBG program, but they are only that. The AFFH certification cannot be separate from the CDBG program's broader goals. (*See* Dkt. No. 71 at 6.)[4]

---

[4] *See also* 24 C.F.R. § 91.225.

Similarly, the Government misstates the role of the citizen participation plan. The plan is not meant to guarantee attendance or involvement. (*See* Dkt. No. 80 at 12.) No plan, however comprehensive or well-intended, can do that, and HUD has not imposed such a requirement. Instead, the citizen participation plan must "encourage participation by citizens with low to moderate income, who reside in areas experiencing slum or blight or will be affected by the proposal." (Dkt. No. 71 at 7 (citing, *inter alia*, 24 C.F.R. § 91.105).) To meet this requirement, the citizen participation plan must provide an "opportunity" for affected persons to voice their opinion, and the City certifies that it is "in full compliance and following" such a plan. 24 C.F.R. §§ 91.105(a), 91.105(k) & 91.225(b)(1). (*See also* Dkt. No. 71 at 7.) Thus, the plan cannot be judged by the number of citizens at a certain hearing or the size of an advertisement's typeface. Instead, the citizen participation plan is properly reviewed and evaluated by HUD, to determine if it meets the criteria set forth in the regulations and guidance. This Court properly dismissed Relators' citizen participation claims. (*See id.* at 62 (Relators' allegations go to the "frequency and thoroughness" of the City's submissions, which are matters "committed to the sound discretion of HUD").)

Finally, the Government's *Wilkins* analysis is off the mark. The Government's comparison of the allegations in this case to the kickback-related claims in *Wilkins* is not well taken. This case concerns the sufficiency of the City's efforts to engage the public and to AFFH when spending CDBG and related federal funds. (*See id.*) It in no way resembles a claim for taking illegal kickbacks. There is not a (plausible) allegation that the City violated a law "designed to prevent or ameliorate fraud, waste, and abuse" (like *Wilkins*), or that it completely ignored an obvious requirement (like *Westchester*), and then lied about it. There is only the claim that the City did not do enough and fully comply with two of the many requirements for

participation in the CDBG and related programs (*i.e.*, it is a claim for malfeasance, not nonfeasance). (*See id*. at 53.) The Court was right to dismiss that claim, and it should not reconsider it.

V.      Conclusion

For the reasons set forth above, the City respectfully requests that the Government's request to reconsider the Court's decision dismissing Relators' claims under Fed. R. Civ. P. 12(b)(6) be denied.

Date: May 27, 2016                                  By: */s/ John C. Hansberry*
                                                    John C. Hansberry (PA I.D. No. 74721)
                                                    hansberj@pepperlaw.com
                                                    Adam B. Fischer (PA I.D. No. 314548)
                                                    fischeab@pepperlaw.com
                                                    PEPPER HAMILTON LLP
                                                    500 Grant Street, Suite 5000
                                                    Pittsburgh, PA 15219-2507
                                                    Tel:    (412) 454-5000
                                                    Fax:    (412) 281-0717

                                                    Lourdes Sanchez Ridge (PA I.D. No. 58685)
                                                    lourdes.sanchezridge@pittsburghpa.gov
                                                    City of Pittsburgh Department of Law
                                                    313 City-County Building
                                                    414 Grant Street
                                                    Pittsburgh, PA 15219
                                                    Tel:    (412) 255-2010

                                                    *Attorneys for Defendants*

CERTIFICATE OF SERVICE

       I, John C. Hansberry, hereby certify that a true and correct copy of the foregoing Response to the United States' Statement of Interest regarding the Court's Order Dismissing this Case has been filed electronically and is available for viewing and downloading from the ECF system. All parties have consented to electronic service.

Date: May 27, 2016                 */s/John C. Hansberry*
                                                      John C. Hansberry