IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| The United States ex rel. Freedom Unlimited, Inc., Northside Coalition for Fair Housing, Inc., The Hill District Consensus Group, Inc. and the Fair Housing Partnership of Greater Pittsburgh, | Civil Action No. 2:12-cv-01600 |
|      Plaintiffs, | |
| v. | |
| The City of Pittsburgh, | |
|     Defendants. | |

**SECOND AMENDED COMPLAINT**

**Preliminary Statement**

1.     The City of Pittsburgh and its chief executive officer (Defendants) since at least 2006 have knowingly and repeatedly submitted or caused to be submitted false claims or statements to the United States in order to obtain Community Development Block Grant and related federal funds.  Plaintiffs bring this action as *qui tam* relators on behalf of the United States to recover all damages, penalties and other available relief to redress this pursuant to the False Claims Act, 31 U.S.C. §§ 3729 et seq.

2.     Defendants have repeatedly falsely certified to the United States that they have acted and are acting to affirmatively further fair housing as expressly required to receive payment of Community Development Block Grant and related federal funds.  Specifically, they have annually, but falsely, certified that they will analyze identified impediments to fair housing, take appropriate actions to overcome these impediments and maintain records of this analysis and these actions.  Contrary to their certifications, they have ignored or refused to carry out their

express duty to address conditions they have identified as perpetuating residential, racial concentration.  Additionally, with each request for payment, or drawdown, of CDBG and HOME funds the City has falsely claimed compliance with these conditions of payment.

3.   Defendants have annually, but falsely, certified to the United States that they maintain and follow a current citizen participation plan which permits full and essential involvement of those affected by or to benefit from federally assisted housing and community development activities.  Contrary to their certifications, Defendants annually have spent large portions of the City's federal allocations, millions of dollars each year, completely outside of the citizen participation process, without providing notice or information from which affected citizens could influence or even ascertain the projects on which these funds have been spent.  Additionally, with each request for payment, or drawdown, of CDBG and HOME funds the City has falsely claimed compliance with these conditions of payment.

4.   Defendants have annually, but falsely, certified to the United States that they are complying with applicable laws which include expending funds only on eligible activities and that they are meeting all required elements of planning to effectuate, as intended, housing and community development that meets national policies and priorities.  Instead, they routinely have diverted much of these funds to ineligible uses.  Additionally, with each request for payment, or drawdown, of CDBG and HOME funds for such uses the City has falsely claimed compliance with this condition of payment.

**Jurisdiction and Venue**

5.   This Court has jurisdiction over this matter pursuant 28 U.S.C. § 1331, as this action arises under the laws of the United States, and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

6.   Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(1) and (2).

**The Parties**

7.   Freedom Unlimited, Inc. is a non-profit, social justice organization located in Pittsburgh's Hill District neighborhood.  It has endeavored to assist community residents by developing strategies to overcome racial discrimination, promote community education and promote low-income resident self-sufficiency through programs and services to build capacity, improve the quality of life, and encourage new and small business development.

8.   The Northside Coalition for Fair Housing is a resident-focused community development organization which seeks to ensure and improve the availability and accessibility of low income and affordable housing in the Northside communities while improving the lives of families.

9.   The Hill District Consensus Group, Inc. is a neighborhood based membership organization dedicated to the full revitalization of the Hill District and the full inclusion of its residents and business owners in this process.

10.   The Fair Housing Partnership of Greater Pittsburgh is a U.S. Department of Housing and Urban Development approved Fair Housing Initiative Program and housing counseling agency dedicated to creating equal housing opportunities in southwestern Pennsylvania through fair housing advocacy and comprehensive housing counseling services.

11.   The United States, through its Department of Housing and Urban Development, is responsible to ensure that the financial resources available to localities that receive federal funds to support housing and community development are administered so as to affirmatively further fair housing and are otherwise administered in compliance with specific program requirements. In distributing these federal funds across the nation, the United States must rely on certifications

from grantees that such funds and other resources available to localities to support housing and community development are being utilized in accordance with explicit statutory and regulatory standards.

12.  The City of Pittsburgh is a municipal corporation duly authorized under the laws of the Commonwealth of Pennsylvania.

13.  Luke Ravenstahl was the mayor of the City of Pittsburgh, Pennsylvania and its chief executive officer from 2006 until 2014.  From 2004 until 2006 he was a member of  Pittsburgh's City Council.

**Statutory and Regulatory Overview**

14.  The False Claims Act (FCA) was originally enacted in 1863, and was substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153. Congress enacted the 1986 amendments to enhance and modernize the Government's tools for recovering losses sustained by false claims against it after finding this to be pervasive.  The amendments were intended to create incentives for individuals with knowledge of such claims to disclose the information without fear of reprisals or Government in-action, and to encourage the private bar to commit resources to prosecuting these matters on the Government's behalf.

15.  Relevant hereto, the Act subjects to liability to the United States any person, including a municipal corporation, who knowingly submits or causes to be submitted a false claim for payment or approval of funds to the United States or who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false claim.  31 U.S.C. §§ 3729(a)(1)(A) and (B).

16.  A person acts "knowingly" for purposes of this section when the person, with respect to information, has actual knowledge of the information, acts in deliberate ignorance of the truth or

falsity of the information, or acts in reckless disregard of the truth or falsity of the information.
No proof of specific intent to defraud is required.  31 U.S.C. § 3729(b)(1).

17.  As set out in the federal Fair Housing Act (FHA), it is the policy of the United States to
provide for fair housing throughout the United States.  42 U.S.C. § 3601.

18.  To this end, the Secretary of the U.S. Department of Housing and Urban Development
(HUD) is responsible under the FHA to administer all federal programs and activities relating to
housing and urban development in a manner affirmatively to further fair housing.  42 U.S.C. §
3608(e)(5).

19.  These programs include the Community Development Block Grant (CDBG) program
authorized by Title 1 of the Housing and Community Development Act of 1974, 42 U.S.C. §
5301 et seq., and regulations promulgated pursuant thereto at 24 CFR § 570.1 et seq., and the
HOME Investment Partnerships (HOME) program authorized by the HOME Investment
Partnerships Act, Title II of the Cranston-Gonzalez National Affordable Housing Act, as
amended, 42 U.S.C. § 12701 et seq., and regulations promulgated pursuant thereto at 24 CFR §
92.1 et seq.

20.  Consistent with the above, Congress has required as a condition of the receipt of CDBG
funding that the City of Pittsburgh and other local recipients of this funding annually certify to
HUD that it will administer this funding in conformity with the FHA and will affirmatively
further fair housing.  42 U.S.C. § 5304(b)(2).

21.  Similarly, Congress through the HOME Investment Partnerships Act has determined that
"[t]he objective of national housing policy shall be to reaffirm the long-established national
commitment to decent, safe, and sanitary housing for every American by strengthening a
nationwide partnership of public and private institutions able", among other things, "to improve

housing opportunities for all residents of the United States, particularly members of disadvantaged minorities …"  42 U.S.C. § 12702 and subsection (3).

22.   As a condition of receipt of HOME funds, Pittsburgh and other grantees again must certify that they will affirmatively further fair housing.  42 U.S.C. § 12705(b)(15).

23.   HUD has set out specific requirements for the receipt of funding to carry out housing and community development projects pursuant to the CDBG, HOME and related programs in 24 CFR Part 91 and in doing so has emphasized that "[t]he overall goal of the community planning and development programs covered by this part is to develop viable urban communities by providing decent housing and a suitable living environment and expanding economic opportunities principally for low- and moderate-income persons. The primary means towards this end is to extend and strengthen partnerships among all levels of government and the private sector … in the production and operation of affordable housing."  This includes "increasing the availability of permanent housing in standard condition and affordable cost to low-income and moderate-income families, particularly to members of disadvantaged minorities".  24 CFR § 91.1(a)(1) and (i).

24.   A grantee, such as Pittsburgh, must comply with consolidated planning requirements, which include the submission of a comprehensive consolidated plan covering CDBG, HOME and certain other federal funds for up to a five year period and a yearly application for funding in the form of a consolidated annual action plan. This consolidated annual action plan is to detail proposed expenditures for that year and must include specific certifications, as required in 42 U.S.C. § 5603(b), for the receipt of CDBG funds for that year.   24 CFR §§ 91.15(b), 91.100 - 91.225.

25.   Specifically with respect to a grantee's duty to affirmatively further fair housing, HUD has provided that in order to receive CDBG and HOME funds a grantee must expressly certify

each year that it "will conduct an analysis to identify impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions in this regard." 24 CFR § 91.225(a)(1).

26.  In order to properly consider actions which may appropriately be taken to overcome an identified impediment, a grantee must analyze the nature, extent and causes of the impediment and the resources available to solve them.  HUD Fair Housing Planning Guide Vol. 1 § 2.4, attached as Exhibit 1.

27.  Though a grantee's affirmative fair housing planning obligations are to be part of and carried out in conjunction with the ongoing planning and reporting components of a grantee's consolidated plans (five year and annual), with respect to fair housing a grantee is to address housing and economic conditions affecting disadvantaged minorities in more depth, and to include all resources available to the grantee for housing and community development, not just the federal funding itself.  24 CFR § 91.520(a) and the HUD Fair Housing Planning Guide §§ 1.2, 2.2 and 2.7.

28.  Overall, through the CDBG program, Congress has sought to address the growth in "concentration of persons of lower income in central cities" and "the growth and persistence of urban slums", 42 U.S.C. § 5301(a), determining that the primary objective of the community development program of each CDBG grantee "is the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income."  42 U.S.C. § 5301(c).

29.  Among other specific objectives, this assistance is to support activities directed toward "the reduction of the isolation of income groups within communities and geographical areas and

the promotion of an increase in the diversity and vitality of neighborhoods through the spatial

deconcentration of housing opportunities for persons of lower income and the revitalization of

deteriorating or deteriorated neighborhoods".  42 U.S.C. § 5301(c)(6).

30.  Congress expressly declared its intent "that the Federal assistance made available under

this chapter not be utilized to reduce substantially the amount of local financial support for

community development activities below the level of such support prior to the availability of such

assistance." 42 U.S.C. § 5301(c).

31.  To this end, as a condition of receiving payment of CDBG funds, grantees must certify to

HUD that "the projected use of funds has been developed so as to give maximum feasible priority

to activities which will benefit low- and moderate-income families or aid in the prevention or

elimination of slums or blight," and that it "will comply with the other provisions of this chapter

and with other applicable laws," which include implementing regulations.  42 U.S.C. §§ 5304

(b)(3) and (6) and 3535(d).

32.  In the implementing regulations HUD has provided with respect to general governmental

expenses that, unless specifically authorized by it, "expenses required to carry out the regular

responsibilities of the unit of general local government are not eligible for assistance under this

part."  24 CFR § 570.207(a)(2).

33.  As a condition of receiving CDBG funding, a grantee must additionally certify to HUD

each year that "it is following a detailed citizen participation plan which … provides for and

encourages citizen participation, with particular emphasis on participation by persons of low and

moderate income who are residents of slum and blight areas and of areas in which [CDBG] funds

are proposed to be used, … provides for participation of residents in low and moderate income

neighborhoods …; provides citizens with reasonable and timely access to local meetings,

information, and records relating to the grantee's proposed use of funds, as required by regulations of the Secretary, and relating to the actual use of funds under this chapter; … [and] provides for public hearings to obtain citizen reviews and to respond to proposals and questions at all stages of the community development program, including at least the development of needs, the review of proposed activities, and review of program performance, which hearings shall be held after adequate notice." 42 U.S.C. § 5304(a)(3)(A),(B) and (D).

34.   Consistent with the above, HUD through its regulatory authority has required that grantees adopt and follow a citizens participation plan, which shall encourage the participation of specific persons who are to benefit from or are at risk of adverse impact by housing and community development projects, which requires the provision of specific information to facilitate this benefit or protect against this risk both as to proposed activities and substantial amendments to these activities including records of past performance, and which provides for the participation of those in the community who are essential to the development and implementation of comprehensive housing and community development planning.  24 CFR § 91.105.

35.   Both in general and with respect to its obligation to affirmatively further fair housing, each grantee must annually identify "measurable outcomes" to achieve clearly defined objectives as required by HUD guidelines.  24 CFR § 91.220(e) and the HUD Fair Housing Planning Guide §§ 2.10 and 2.11.

36.   Specifically with respect to CDBG funded activities each grantee must identify actions to be taken "in sufficient detail, including location, to allow citizens to determine the degree to which they are affected".  24 CFR § 91.220(l)(1)(iv).

37.   To allow for effective citizen participation each grantee must also review and report on an annual basis on the progress it has made in carrying out the five year strategic and annual action

components of its consolidated plan. This "performance report must include a description of the resources made available, the investment of available resources, the geographic distribution and location of investments, the families and persons assisted (including the racial and ethnic status of persons assisted), actions taken to affirmatively further fair housing, and other actions indicated in the strategic plan and the action plan." 24 CFR § 91.520(a).

38.  This performance report must include an assessment of the grantee's performance with respect to affirmatively marketing affordable rental housing that it has assisted with federal HOME funds.  24 CFR § 91.520(e).

39.  This annual performance report must include a comparison of the proposed and actual outcomes with respect to each outcome measure identified in the annual action component of its consolidated plan and explain, if applicable, why progress was not made.  24 CFR § 91.520(i).

**Statement of Facts**

40.  Since at least 2006, the chief executive and the City of Pittsburgh (hereafter "City") repeatedly have made false statements and certifications of compliance with specific prerequisites for the receipt of CDBG, HOME and the related federal funds.

41.  This has expressly occurred through each annual application for funding.  This has additionally occurred during program administration including claims for payment or drawdown of funds when the City has impliedly, if not expressly, stated that it is acting in accordance with grant conditions.

42.  The extent of funding made available by HUD to all grantees of this funding on a national level and the limited resources available to HUD to monitor compliance with the requirements of these programs make it necessary for the United States to rely on the certifications by grantees that these conditions are being met.

43.  The Defendants have falsely certified each year (i) that the City is meeting its responsibility to affirmatively further fair housing, that is that it "will conduct an analysis to identify impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions in this regard," (ii) that it maintains and follows a current citizen participation plan which permits full and essential involvement of those affected by or to benefit from federally assisted housing and community development activities, and (iii) that it is complying with applicable laws which include the requirement to expend funds only on eligible activities.

44.  Relevant hereto the certifications made by the chief executive on February 12, 2009 are the same as those made each year since at least 2006.  A copy of these certifications is attached as Exhibit 2.

45.  Additionally, with each request for payment, or drawdown, Defendants have falsely certified their compliance with the fair housing and public participation conditions of payment, and with respect to those requests for payment, or drawdowns, which have been used to fund regular governmental expenses, Defendants have falsely certified their compliance with the condition of payment prohibiting this very practice.

46.  Relator Fair Housing Partnership of Greater Pittsburgh (FHP) has carried out fair housing advocacy including counseling, support, testing, enforcement and education in the City since well before 2006.  During this time it has pursued all avenues available to it to assist low income, minority residents of the City obtain fair housing including advocating for programs and policies which promote fair housing at public meetings held by the City when it has become aware of such meetings.

47.  It has directly observed that the City repeatedly since at least 2006 has not analyzed impediments to fair housing as it has certified to receive federal funding. It has directly observed that during this period the City has not determined or otherwise taken appropriate actions to address impediments which it has identified.

48.  On February 18, 2013 the City completed what it described as an update to an analysis of impediments which it had completed in February 2007.  It had described the 2007 analysis as an update to an analysis of impediments done in 2000.  The FHP would be aware of any other analyses of impediments to fair housing by the City or actions proposed or taken to address impediments identified during this period.  However, it has directly observed that this has not occurred.

49.  The City through its consolidated planning since 2000 has identified as an impediment to fair housing the serious shortage of decent, safe and affordable housing, particularly rental housing, for low and very low income black families in areas of the City that are not low income and minority concentrated.

50.  During the same time the City has recognized as an impediment to fair housing that governmentally assisted housing for families, both publicly and privately owned, including that which is available to families displaced by publicly funded projects, is largely, if not entirely, located in low income and minority concentrated areas of the City and largely occupied in a racially concentrated manner.

51.  The City in its identification of impediments in February 2007 also recognized that there are less amenities including services available in low income, minority concentrated neighborhoods than in other City neighborhoods.

52.  However, the City has not analyzed these impediments including by determining appropriate actions with measurable outcomes to address them.

53.  HUD has determined that "appropriate actions" are those with measurable outcomes with consideration to effectiveness and available resources. HUD Fair Housing Planning Guide Vol. 1 §§ 2.4 - 2.6 (Exhibit 1).

54.  Despite the City's certifications, no appropriate actions have been proposed or, if proposed, taken to address residential racial concentration and the lack of affordable housing in areas not concentrated by race and poverty.

55.  Nor has the City proposed or taken steps with measurable outcomes to address the identified inequity in amenities available in low income, minority concentrated neighborhoods throughout the City.

56.  In 2008 the City proposed to spend $2 million by 2009 to increase the supply of affordable housing to address the limitation on choice of neighborhoods.  However, Relators FHP and Northside Coalition for Fair Housing (NCFH) have directly observed that there has been no production of affordable housing, nor such housing marketed to minority households, in areas that are not racially and low income concentrated, and consequently they have been unable to inform their constituents of any such opportunity.

57.  Furthermore, had such housing of five or more units been produced with federal assistance, affirmative fair housing marketing plans would have been produced as required by the City's Urban Redevelopment Authority.  This policy and procedure has been reported by the City in each Consolidated Annual Action Plan since 2010.  Relator NCFH on September 21, 2012 requested copies of any such marketing plans through 2011 and none have been provided.   Nor has it or the FHP received or become aware of any such marketing plan since that time.

58.  On or about June 30, 2010 the City in a Comprehensive Annual Performance Report purported to address, as a fair housing impediment, the lack of economic opportunities in minority neighborhoods.  Other than through a generally available small business loan program, it reportedly did so through its Mainstreets Program.  However, Relaters NCFH, Freedom Unlimited and Hill District Consensus Group directly observed that the Mainstreets Program operated solely in predominantly white business districts with one exception, a district in a neighborhood undergoing gentrification and displacement.

59.  On or about June 30, 2010 the City in a Comprehensive Annual Performance Report stated to HUD that an expected outcome of its CDBG program to promote fair housing during the previous year was the completion of an update to its analysis of impediments to fair housing. FHP and NCFH are directly aware that no such completion occurred.  In addition, in July 2011, following a request pursuant to the Pennsylvania Right to Know Law, the City confirmed to NCFH that no analysis of impediments to fair housing had occurred subsequent to February 2007. Nor did this occur as expressly required in subsequent years despite Defendants' certifications.

60.  On June 30, 2011 the City in a Comprehensive Annual Performance Report falsely stated to HUD that during the previous year it addressed the fair housing impediment it identified as "concentrations of low-income persons, minorities and female headed households which lack decent, safe and sound housing that is affordable, which impact neighborhoods in the City."  To the Relators' direct knowledge in working with such individuals and households such concentrations and the lack of decent affordable housing was not addressed.

61.  In February 2007 the City and its Chief Executive stated in the City's Analysis of Impediments to Fair Housing update that the City "uses the services of the Fair Housing Partnership of Greater Pittsburgh, Inc. to conduct surveys and provide information and

coordination with all housing and human service agencies."  Although Relator FHP would have carried out these responsibilities, and in fact has coordinated fair housing activities with other agencies, it was never so engaged or asked to be so engaged by the City.

62.  In February 2007 the City and its Chief Executive stated in the City's Analysis of Impediments to Fair Housing update that the City assigned the FHP, along with the City Commission on Human Relations and the City itself, the responsibility to "[f]urther assess the issue regarding access to affordable housing by conducting an inventory of accessible units, need for specific accessibility features in units, and develop recommendations to increase marketing of accessible units to disabled and elderly renters."  It was reported that $500,000 was proposed to complete this responsibility by 2009.  However, the FHP has never been so designated or engaged by the City.  Nor, despite its coordination of fair housing activities with the Commission on Human Relations, is it aware of any such activity by this Commission.

63.  In February 2007 the City and its Chief Executive stated in the City's Analysis of Impediments to Fair Housing update that the City assigned the FHP, along with the City Commission on Human Relations, the responsibility to "[i]mprove the accessibility of emergency shelters and transitional housing locations to accommodate handicapped persons."  It was reported that $1,500,000 was proposed to complete this responsibility by 2009.  However, the FHP has never been so designated or engaged by the City.  Nor, despite its coordination of fair housing activities with the Commission on Human Relations, is it aware of any such activity by this Commission.

64.  In February 2007 the City and its Chief Executive stated in the City's Analysis of Impediments to Fair Housing update that the City assigned the FHP, along with the City Commission on Human Relations and the City Housing Authority, the responsibility to

"[m]aintain and support efficient and effective fair housing monitoring, investigation, and enforcement strategies."  It was reported that $1,500,000 was proposed to complete this responsibility by 2010.  However, the FHP has never been so designated or engaged by the City.  Nor, despite its coordination of fair housing activities with other agencies and particularly the City Commission on Human Relations, is it aware of any such activity by this Commission or the City Housing Authority.

65.   In February 2007 the City and its Chief Executive stated in the City's Analysis of Impediments to Fair Housing update that the City assigned the FHP, along with the City Commission on Human Relations and unspecified social service agencies, the responsibility to "[f]und and support the delivery of fair housing services to at-risk groups and victims of housing discrimination."  It was reported that $250,000 was proposed to complete this responsibility by 2010.  However, the FHP has never been so designated or engaged by the City.  Nor, despite its coordination of fair housing activities with other agencies and particularly the City Commission on Human Relations, is it aware of any such activity by this Commission or by other social service agencies.

66.   In contrast to the $3,750,000 purported to be made available to carry out the specific assignments referenced in ¶s 64-67 from 2007 to 2010, the City Commission on Human Relations received $35,000 per year in CDBG funding from the City or a total of $140,000 through March 31, 2011.  During this same period Relator FHP received no CDBG funding.

67.   On June 30, 2011 the City falsely stated in its 2010 performance report that during the 2010 funding year the City addressed its strategy of promoting fair housing entirely through the City Human Rights Commission and Relator NCFH.  It references grants to these entities in the

amounts of $35,000 and $15,000 respectively.  However, no contract was entered into with NCFH to promote fair housing.

68.  On February 13, 2013 the City and its Chief Executive falsely stated in the City's Analysis of Impediments to Fair Housing update that the City annually funds the FHP to provide testing and contract compliance.  Relator FHP is directly aware that this is false.

69.  Other than an unexpected mid-year grant during 2012 of $17,000, Relator FHP had received no CDBG funding from 2007.

70.  The February 2013 analysis of impediments update continues to acknowledge the concentration of federally assisted housing in areas of low income concentration.  However, it fails to acknowledge, as it had previously, the concentration of such housing in areas of racial concentration, nor does it engage in any analysis of racial segregation or concentration or discrimination.

71.  With respect to concentration of assisted housing in areas of low income concentration, there continues to be no actions with measurable outcomes proposed to address this.

72.  The production of affordable housing and improving ability to afford housing cost is generally referenced without any indication of how racial concentrations will be affirmatively addressed.

73.  There is no analysis of whether discrimination has produced more severe conditions and restrictions experienced by racial minorities.

74.  There is no indication of whether or how affordable housing will be located in non-minority concentrated areas, specific benchmarks to realize this and how this will be marketed.

75.   The chief Executive and the City have also falsely certified that the City is in full compliance and following a detailed citizen participation plan that satisfies the requirements of 24 CFR § 91.105.

76.   Through her employment and through discussions with her City Council representative, Ronell Guy, as executive director of Relator NCFH, became aware during the mid-2000s that substantial CDBG and HOME funds were being made available to the City each year.  Yet how these funds were allocated was not made known.

77.   Though her initial objective was to learn how to obtain a portion of these funds to assist low and very low income residents of her Northside and similar Pittsburgh neighborhoods, she began to question why she and her organization were not provided more information about the operation of these programs.

78.   Since that time she has reviewed the City's citizen participation plan and has learned that the City has both failed to keep this current and follow it.  For example, she has known that the City office given the responsibility in this plan to address residential displacement and relocation has been closed for more than a decade despite its need and its stated existence in the City's written plan.

79.   This citizen participation plan must set forth the City's plan to minimize displacement and assist those who are displaced and state how this information will be made available. Citizens who are directed to this plan and consult it are informed that the Central Relocation Agency of the Housing Authority of Pittsburgh has been designated as the vehicle to carry this out.  However, there is no plan to minimize displacement and the designated relocation office has been closed.  Relator NCFH, through its executive director, informed the City of this and the

continuing need to minimize displacement and the harm it causes.  Yet, despite the City's failure to adopt and follow a plan as required, it continues to certify each year that it is doing so.

80.   Defendants have additionally failed to adopt and follow a plan which encourages the participation of assisted housing residents, those living in blighted areas and those living in areas where CDBG funds are proposed to be used.  Although the City states that it makes special efforts to encourage participation by public housing residents and those of low and moderate income, it has failed to carry this out.   Relators NCFH, HDCG and Freedom Unlimited whose members make up these whose participation is to be encouraged are aware first hand that this has not occurred.

81.   The City conducts two public meetings each year to consider comments on the need for CDBG assistance in the upcoming fiscal year, as it is required, yet limits the advertisement for these meetings to small print legal notices, which HUD has expressly provided in 24 CFR § 91.105(e)(2) do not provide adequate notice.

82.   Even small print legal notice notification of the 2010-2014 comprehensive consolidated plan public meetings to solicit citizen comment on the City's long range use of CDBG funds did not occur, as was falsely stated.  Relators and their members and constituents were not notified of any such planning meetings and have been unable to locate any newspaper or other advertisement of such meetings to citizens generally.

83.   Defendants have annually certified that in complying with its Citizen Participation Plan it mails notices of public hearings to its mailing list of community based organizations and non-profit organizations, which includes Relators NCFH and FHP.  However, these organizations were not mailed notices or otherwise informed of hearings by the City.

84.   Relator FHP was not even notified of the public hearing on the City's 2012 update to its Analysis of Impediments to Fair Housing despite the central implementation role the City has purportedly given it.  It accidentally learned of the issuance of this "analysis" after it was issued and well after the opportunity to comment had passed.

85.   Defendants have routinely failed to make available information on how it proposes to use a substantial portion of its CDBG and HOME funds including funds allotted for distribution through the Mayor, individual members of City Council and its Department of Planning, in addition to substantial sums it subsequently reallocates to a different activity.

86.   When information has been provided about proposed activities, Defendants have failed to provide this as required, including location, to allow citizens, particularly those in need, to determine whether and how they are affected and to comment.  For example, with respect to large sums ($2,047,859 in the 2011 annual action plan) allocated to the City Urban Redevelopment Authority for "funding to non-profit and for profit developers for acquisition and rehabilitation of new construction of residential rental housing primarily for low and moderate income households and special populations" the City fails to provide any information on where such funds are proposed to be used, for whom and how.

87.   The draft consolidated annual action plans that the public is invited to comment on routinely propose to use large sums of CDBG funds for "Unspecified Local Options", i.e. funds to be distributed by the mayor and individual members of Council as they choose.  Those affected by CDBG funds or the lack thereof are unable to comment on how these funds are actually proposed to be used.

88.   For example, the 2011 draft annual plan advertised for comment designates $1,600,000 as Unspecified Local Option – Mayor and City Council.

89.  However, this is not the draft then sent to HUD.  That annual plan largely specifies who are to receive these funds.  Thus HUD is not informed that those whose comments are to be encouraged have not been provided an opportunity to comment on these allocations.

90.  In its draft annual action plan for 2011 made available on January 10, 2011 the City failed to provide any information or sufficient information to allow comment by those who it certified were being given the opportunity to do so on how it proposed to use $7,897,859 in CDBG and HOME funds.  This includes unspecified allocations to be made by the Mayor, City Council, the City Planning Department and the City Urban Redevelopment Authority as well as program income from prior years' expenditures.

91.  Similarly, the City in its draft annual action plan for 2012 that it made available on January 11, 2012 failed to provide any information or sufficient information to allow comment by those who it certified were being given the opportunity to do so on how it proposed to use $4,345,606 in CDBG and HOME funds.  This includes unspecified allocations to be made by the Mayor, City Council, the City Planning Department and the City Urban Redevelopment Authority as well as program income from prior years' expenditures.

92.  Likewise, in its draft annual action plan for 2013 that it made available on January 9, 2013 the City failed to provide any information or sufficient information to allow comment by those who it certified were being given the opportunity to do so on how it proposed to use $5,345,106 in CDBG and HOME funds.  This includes unspecified allocations to be made by the Mayor, City Council, the City Planning Department and the City Urban Redevelopment Authority as well as program income from prior years' expenditures.

93.  The annual action plan for 2013 then submitted to HUD added $2,670,000 for neighborhood business and economic development without any opportunity for citizen

participation and without specificity as to how and where this would be used.  The opportunity for public comment that HUD was informed had been provided had not.

94.  The City in its draft annual action plan for 2014 that it made available on April 11, 2014 also failed to provide any information or sufficient information to allow comment by those who it certified were being given the opportunity to do so on how it proposed to use $7,123,590 in CDBG and HOME funds.  This includes unspecified allocations to be made by the Mayor, City Council, the City Planning Department and the City Urban Redevelopment Authority as well as program income from prior years' expenditures.

95.  By way of further example, on June 30, 2011 the City stated in its 2010 performance report that it expended $15 million in CDBG funds to construct parking garages, other infrastructure and a park to support a newly developed, Southside Works residential and commercial complex, which the City Urban Redevelopment Authority describes on its website as providing "upscale urban living spaces."  It also reported that $10,500,000 was spent on infrastructure and a parking garage at the Pittsburgh Technology Center.  In neither case are Relators aware of any advance notice of the proposed use of CDBG funds for these activities or an opportunity to comment on these, contrary to the City's certifications regarding citizen participation.

96.  Defendants have failed to provide reasonable access to reports on how and where funds have been expended as required by 42 USC § 5304(a)(2)(D) and (E) and (3)(B) and 24 CFR § 91.205(h), and, as a consequence, to provide a meaningful opportunity to comment on such expenditures, including the reallocation of funds.

97.  Relator NCFH repeatedly sought information from the City from January 2011 through July 2011, both informally and through a Pennsylvania Right to Know Act Law request, to

determine how and where CDBG and related funds had been expended.  It did so because its review of City performance reports did not provide this information.

98.  Contrary to the Defendants' citizen participation certification, as well as federal law and its Citizen Participation Plan, which call for reasonable access to this information, this was not provided.

99.  On July 28, 2010 Relator NCFH was notified that it was awarded $15,000 in CDBG funds through the year end budget process of the City Council and Mayor's Office.  There was no citizen notification or comment opportunity to NCFH or others prior to this award.

100.  At about that time NCFH's executive director Ronell Guy attended a meeting with City officials and questioned how decisions to reallocate CDBG funds during the program year were made.  She was informed that the mayor makes such determinations.  She is directly aware that no citizen notice and comment process is then carried out.

101.  Representatives of the NCFH have otherwise observed substantial reallocation of CDBG funds to other activities by or at the request of the City's chief executive without notice of a public hearing to provide comment or objection as required in its Citizen Participation Plan and HUD regulations.  For example on June 4, 2010, the City reallocated $381,200 in CDBG funds to its public works street resurfacing budget without compliance with its Citizen Participation Plan.

102.  On August 15, 2010, Relator HDCG member George Moses submitted written objections to the Assistant Director of the Department of City Planning to the reallocation of CDBG funds without providing a reason for this as well as objection to particular activities that should have been done with City capital dollars. No response was given.

103.     The City falsely reported in its 2011 consolidated annual action plan that it accepted all comments provided at the public hearings it held regarding this plan.  To the contrary, Relator

HDCG member George Moses objected at a public hearing on August 19, 2010 to the City's use of CDBG funds for projects that should be funded with its capital funds.  This comment was not accepted by the City and no explanation was provided to HUD as to why it was not, as called for by this plan.

104.  The Chief Executive and the City have also falsely certified that the City is acting in compliance with HUD regulations which restrict it from using CDBG funding to pay for its regular governmental responsibilities.  Relators have been directly aware from living and working in City neighborhoods that the City regularly carries out a City-wide street repaving schedule and routinely undertakes on a City-wide basis such activities as bridge repair, municipal building repair and street lighting and traffic control equipment purchase and repair. They have become directly aware that substantial CDBG funds partially pay for these activities.

105.  Sala Udin had been a founding member of Relator HDCG.  Afterward, while serving on the Pittsburgh City Council, he repeatedly objected to City officials, including its Director of Planning, that the City should not be using CDBG funds for its regular responsibilities, that these costs should be funded with its tax revenue, and, instead, that CDBG funds should be used, as intended, to restore deteriorating lower income neighborhoods.

106.  At about the time the City was formulating its 2005-2009 comprehensive consolidated plan, he also spoke with constituents Ronell Guy of the NCFH and HDCG member George Moses about this, each of whom has also repeatedly objected to the City's use of CDBG funds to pay for its infrastructure costs to the neglect of its lower income neighborhoods.

107.  Udin was the Chair of the City Council Budget and Finance Committee.  As such, he was aware that funds committed to the City's capital budget, including CDBG funds and tax

generated funds, were fungible and together were applied to the City's regular capital needs including street resurfacing.  There was no accounting for where specific dollars were used.

108.  He was also a Board member of the Pittsburgh Urban Redevelopment Authority (URA), which received considerable CDBG and HOME funds to carry out major residential and economic development projects in the City.  The allocation of these funds along with others available to the URA to particular development projects were not subject to the City's public notice and comment Citizen Participation Plan process.

109.  Since at least late 2009, additional representatives of Relators NCFH and HDCG have raised with the City the illegality of using CDBG funds to pay for responsibilities it undertakes City-wide.

110.  Contrary to Defendants' certifications that the City will comply with applicable laws and regulations in each fiscal year from at least 2006 the City used CDBG funding on activities that it undertakes City-wide as regular responsibilities.

111.  In 2008, for instance, the amount is believed to be at least $2,540,000.

112.  In 2009 the amount is believed to be at least $1,950,000.

113.  In 2010 the amount is believed to be at least $4,868,800.

114.  In 2010 one member of City Council, the Reverend Ricky Burgess, expressed to the entire Council that continuing to fund its normal responsibilities with CDBG funds is illegal.

115.  Yet the use of CDBG funds by the City to pay for its regular responsibilities has continued notwithstanding its certifications that it is using CDBG funds in compliance with applicable legal requirements.

116. On March 15, 2011 Councilman Burgess expressly sought to amend the City Capital and CDBG Budget to prevent the illegal use of CDBG funding of the local portion of the Capital Budget in the amount of $2,700,000. He did not succeed.

117. Contrary to Defendants' certifications that the City will comply with applicable laws in 2011 the amount of CDBG funding used by the City on activities that it undertakes City-wide as regular responsibilities is believed to be at least $5,820,000.

118. In 2012 the amount is believed to be at least $3,565,357.

119. In 2013 the amount is believed to be at least $2,682,500.

120. In 2014, for instance, the amount is believed to be at least $1,816,860.10.

121. In 2015, the amount is believed to be at least $4,686,872.50.

122. In 2016, the amount is believed to be at least $3,920,940.71.

123. In 2017, the amount is believed to be at least $2,667,506.20.

124. As set out above, the City and its chief executive have been fully aware of the falsity of their certifications, or have acted in deliberate ignorance of their truth, as they have been repeatedly informed of the falsity of their certifications and as these certifications state precisely what is being certified or make express reference to requirements certified as being satisfied. Yet the City and its chief executive have continued to make these certifications since at least 2006 in order to obtain CDBG and related federal funds during this period.

125. Relators have informed the United States of the allegations, transactions and information upon which these claims are based prior to raising them in this suit.

**Prayer for Relief**

Accordingly, this Court is hereby requested to grant the United States and Relators, as appropriate, that relief as is authorized by 31 U.S.C. §§ 3129 et seq. and proper under the circumstances including:

a.   That the United States be awarded civil penalties and damages because of the false claims alleged within the Complaint, as provided by 31 U.S.C. § 3729(a)(1).

b.   That pre- and post-judgment interest be awarded;

c.   That Plaintiff Relators be awarded the maximum amount of the proceeds allowed to it pursuant to 31 U.S.C. § 3730(d);

d.   That Plaintiff Relators be awarded their reasonable attorneys' fees and costs; and

e.   That this Court award such other relief as is just and proper.

Respectfully submitted:


s/s Kevin Quisenberry
Kevin Quisenberry
PA ID# 90499

s/s Donald Driscoll
Donald Driscoll
PA ID# 21548

Community Justice Project
100 Fifth Avenue, Suite 900
Pittsburgh, PA 15222
(412) 434-6002

Counsel for Relators